STATE OF IOWA, Appellee, v. HUGH A. RITCHIE et al., Appellants.

**LARCENY:** **Trick or Device.** Principle reaffirmed that *fraud* may supply or take the place of *trespass* in larceny. In other words, there may be a larceny *by deceit*. So held as to the charge of larceny of a deed.

**CRIMINAL LAW:** **Trial—Instructions—Reasonable Doubt—Absence of Evidence.** It is not necessarily reversible error for the court to

instruct that a reasonable doubt is one which naturally and fairly arises from a consideration *"of all the evidence,"* without any specific reference by the court to the effect of an *"absence of evidence."*

*Appeal from Woodbury District Court.*—C. C. HAMILTON, Judge.

### DECEMBER 15, 1922.

### REHEARING DENIED SEPTEMBER 19, 1923.

HUGH A. Ritchie, J. R. Welch, and M. Farrar were jointly indicted for the alleged larceny of a certain deed of real estate, said instrument being the property of one L. S. Wentz. Ritchie, being separately tried, was adjudged guilty as charged, and appeals.—*Affirmed.*

*George G. Yeaman* and *B. I. Salinger,* for appellants.

*Ben J. Gibson,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, and *O. T. Naglestad,* County Attorney, for appellee.

WEAVER, J.—On October 18, 1917, L. S. Wentz, then a resident of Dickinson County, Iowa, was the owner of a tract of land in Harrison County, Iowa, alleged to contain 295 acres. One Hagerty, who figures in the case, was a real estate agent at Spencer, in Clay County, and the defendants Ritchie, Welch, and Farrar were engaged in like business at Sioux City. There is evidence tending to show that, in the summer of 1917, Wentz listed his land with Hagerty, with authority to sell it at $30 per acre cash, or to effect a trade or exchange for other property at an estimate of $35 per acre. Thereafter, there was some negotiation between Hagerty and Ritchie, the latter claiming to have a client owning a section of Canada land which he might be induced to exchange for the Wentz property. At Ritchie's representation of a prospect, and his request to Hagerty to come to Sioux City and "bring the papers," the latter obtained from Wentz and wife a deed for the land to a blank grantee, and went

with it to Ritchie's office. Concerning what occurred on that occasion, there is a sharp conflict of evidence; but the jury could properly find therefrom that defendant called in his co-defendants Welch and Farrar, and introduced them as the owners of a section of Canada land, which they would exchange for the Wentz property. These men professed to be having some temporary trouble in "squaring" their title to the land they proposed to convey to Wentz, but an agreement was finally reached, and certain writings made. These instruments consisted of a contract for an exchange of the properties within the next ten days, the Canada land having no definite description except as being "in the county of Cariboo, Fort George District, British Columbia," being "their 640 acres" in said district. This contract also provided that "all papers necessary in carrying out the agreement be deposited with Hugh A. Ritchie and to be turned by him for whom intended when in his estimation they have been earned as per the terms of this agreement." Pursuant to this agreement, Hagerty placed the deed from Wentz in the hands of the defendant Ritchie, who gave his receipt therefor, reciting that the instrument was to be turned over "to J. R. Welch and M. Farrar when they deliver to me their section of Canada land per contract." On November 3, 1917, and after the 10-day period named in the contract had expired, defendant wrote Hagerty, saying:

"In looking over the abstract, I find that the deed was made out wrong so I am inclosing you another deed so have Mr. Wentz and his wife sign before a notary public and return it to me then I will be able to close up the deal as I have all the necessary papers in carrying it out."

This call for a new deed was not complied with, and later, in response to an inquiry by Hagerty, defendant or one Gregory, an occupant of his office, wrote:

"Dear Sir: I just had a talk with Mr. Farrar concerning your letter of November the 9th. I have learned from Mr. Farrar and Welch that you need not be uneasy in any way about the final closing of this deal. The truth about the matter is they have been delayed in getting their papers on the Canada section and it is only a matter of time when everything will be

settled according to the contract.  We know the time of settlement was October 28th, but I see no reason why we should be uneasy in any way for at least a while yet.  They have paid the commission on their end of the deal and the $300 cash will be honored when the deal is finally closed.  They would not have paid any commission unless they intended to go on through with the deal.  I can't see from the tone of their conversation where they are attempting to take an undue advantage of you. We will advise you immediately upon their notifying us when they are ready.

"Yours respectfully,
"By Dell Gregory."

Again, on November 16, 1917, he wrote Hagerty again, saying:

"We just had a talk with Mr. Farrar and Welch concerning the closing up of the deal.  *They are ready, able, and willing to close the deal as per the contract.*"

He called attention, however, to the alleged fact that the transfer of the Harrison County land was to be made subject to an incumbrance of $2,500 only, while the abstract indicated a mortgage of $2,800.  On November 28, 1917, defendant wrote Hagerty still another letter concerning the deal, which is not shown in the record and cannot be found.  Soon thereafter, Hagerty again visited the defendant with reference to the business, and was then told by him that Welch and Farrar had got possession of the Wentz deed.  Defendant further informed him that Welch and Farrar had "put up" or offered to put up certain "mill property" and certain Nebraska land, to secure their performance of the agreement to convey the Canada land. Hagerty replied that he didn't know about that, and would have to refer it to Wentz.  The matter continued to drift along in this manner, and Hagerty continued to press for settlement. On January 16, 1918, defendant again wrote:

"I am at last getting close to the closing of the deal with Farrar and Welch.  I have put this proposition right squarely up to them and think that everything will be fixed up within the next two days.  *They will either deliver you the Canada land*

*or return you your original papers*, so just be patient a little longer and I will see what can be done. Would you waive the $150 if they can get this Canada section and clean up the deal? The money is what is now bothering them. Kindly advise me by return mail, and oblige,

"Yours respectfully,

"Hugh."

Here again the promised settlement hung fire, and on February 7, 1918, defendant once more reported, saying:

"I have been unable to do anything with Welch and Farrar. I still have the land in Keyapaha County, Nebr., that they put up for collateral. The land is subject to $3,500 incumbrances, but I consider it worth a great deal more than one of the Canadian sections. Now if you want this in lieu of the section, I will send deed so you can file it. They are making a strong effort to get the Johnson deed back, but, if you want it in lieu of the Canadian land, I will send it to you and close up the deal.

"Yours truly,

"Hugh A. Ritchie."

This proposal to substitute the Nebraska property in lieu of the Canada land was not accepted. In May following, Hagerty and Ritchie again met in Sioux City. As a result of that interview, a writing was executed between Hagerty and Farrar, as follows:

"This agreement made and entered into this 24th day of May, 1918, by and between O. R. Hagerty, party of the first part, and Jack Welch and Meldon Farrar, parties of the second part, witnesseth: Whereas a certain contract was entered into for the exchange of certain Canada land, it is fully understood between all parties hereto that said second parties are depositing a deed to the north half of Section 22, and the north half of the northeast quarter of the southeast quarter of Section 21, Township 34, Range 20, in Keyapaha County, Nebraska, same *to be held in escrow by said O. R. Hagerty until June 3, 1918, at which time said Welch and Farrar agree to deliver section of land in*

*Cariboo District, British Columbia.* If, on said Hagerty's option, he prefers to keep the said Nebraska land, he may do so. Witness our hand and seal this 24th day of May.

"[Signed]  M. Farrar.
"[Signed]  O. R. Hagerty."

As a part of the same transaction, Welch executed a warranty deed to Wentz for 400 acres of land in Nebraska, subject to an incumbrance of $3,500, which deed, with the foregoing contract, was deposited with Hagerty to be held pending the completion of the conveyance of the Canada land to Wentz, as specified in the contract. At the same time, Hagerty received from defendant the sum of $100 commission, and gave him a receipt in full for the deal with Welch and Farrar. Hagerty at once sent the deed received from Welch for record in the proper county, but record was refused, and the deed returned, with notice that the grantor (Welch) had no title to the described property. The promise to convey the Canada land to Wentz was never performed, and indeed there is no competent evidence that Welch or Farrar or defendant owned an acre of Canada land which they could convey in performance of the contract. To excuse or justify the delivery of the deed of the Harrison County land to Welch and Farrar, it is claimed on the part of defendant that, later on the same day when the deed was deposited with defendant (October 18, 1917), Hagerty, Welch, and Farrar returned to the office of Ritchie, in the absence of the latter, and told the stenographer that they wanted to take up the deed to the Harrison County land and give another in place of it, for South Dakota property. This request the stenographer says she at first refused, not feeling authorized to surrender the deed, but that, on the advice of Gregory and one Bennett, who were present, she yielded, and gave up the deed. Hagerty positively denies this alleged transaction; and, although the stenographer is corroborated by a casual visitor, one Bennett, there is ample justification in the record for the jury's awarding the palm of veracity to Hagerty. The indictment in the case charges that defendant with Welch and Farrar did "willfully and feloniously, by trick and artifice, and by false pretenses and with felonious intent to steal, take,

and carry away from another, to wit, L. S. Wentz, and convert the same to their use and deprive the owner thereof without his consent, did then and there, in the manner aforesaid obtain, take, steal, and carry away from O. R. Hagerty, then and there being the agent and employee of and acting in behalf of the said Wentz, a certain deed in writing,'' describing it.  On trial to a jury, the defendant was found guilty as charged.  For a reversal of the judgment of the trial court, it is argued:

I.  That, the indictment having charged that the alleged larceny was accomplished by trick, artifice, false pretenses, and with felonious intent, it became incumbent on the State to prove

1. LARCENY: trick or device.

this specific allegation and establish it beyond a reasonable doubt; and it is the contention of counsel that there is an entire absence of evidence of trick or artifice or false pretense.  To this we cannot agree.  Counsel concede in argument that our prior decisions settle that larceny may be committed by an obtaining and retaining through trick or by false pretenses or both.  The further contention for appellant that the allegation of trick and artifice, even if not necessary or essential to the charge of larceny, must be specifically proved, to sustain a conviction, may also be admitted for the purposes of this case, though we by no means admit its soundness as a legal proposition.  But even assuming such burden, the record made is clearly sufficient to satisfy it.  The question presented is whether the jury could properly find from the evidence that defendant Ritchie, acting for himself or in conjunction with Welch and Farrar or either of them, took the deed into his possession for the professed purpose of holding the same on deposit to await the production and delivery of a deed for the Canada land, but with the secret purpose to deprive the grantor of his property therein or to convert it to his own use or to wrongfully deliver it to his codefendants or to permit them so to convert it to their use, and that, in execution of such wrongful intent, he delivered it without authority, or knowingly permitted its surrender or delivery to his codefendants or either of them.  If such state of facts be shown, he is guilty as charged, under the conceded rule of law.  In short, the question of primary importance is the real intent and purpose with which defendant obtained the possession of the deed;

and while his intent or purpose is a fact to which he may testify, his credibility in that respect is to be tested by the admitted or well proved circumstances of the transaction and the consistency or inconsistency of his conduct with his offered explanations and denials. See *State v. Davis,* 38 N. J. L. 176; *Commonwealth v. Mason,* 105 Mass. 163; *Commonwealth v. Weston,* (Mass.) 135 N. E. 469. Ascertaining from Hagerty the desire of Wentz to sell or exchange his Harrison County property, he represented that he had a client or clients owning Canada land who would or might make the exchange on certain terms. From this starting point, and bearing in mind that the record is without any competent evidence that he or his alleged confederates or either of them had or controlled any Canada land whatever, it is not difficult to trace the path by which the jury reached its conclusion. Welch and Farrar having been produced as his alleged principals, and terms of exchange having been agreed upon, its consummation was postponed on the plea that Welch and Farrar desired ten days' time to "square up" their title; and the deed which defendant had directed Hagerty to bring from Wentz was deposited with defendant, to be delivered only when the necessary conveyance of the Canada land was produced. This, it will be remembered, was on October 18, 1917, and the parties then separated, to give the alleged owners of the Canada land ten days in which to perform their agreement; but before sundown of that same day, the Wentz deed so deposited in defendant's hands was, without the knowledge or authority of Hagerty or Wentz, delivered over to Welch and Farrar, without any pretense of performance on their part. Defendant seeks to avoid any imputation of criminal intent on his part by saying that the surrender of the deed was the act of Miss Walsh, his stenographer, or of the man Gregory who occupied his office, and who, according to Miss Walsh, attended to the business of the office in the absence of the defendant, and who had represented the defendant to some extent in making the deal. He also offers the same witnesses to show that Hagerty was present and consented to the delivery of the deed; but the truth of this statement is denied, and the jury could properly refuse to credit it. Defendant admits, however, that on the following morning, October 19, 1917, he learned of the sur-

render of the deed and rebuked his clerk for doing it; but there is no pretense that he at once notified Hagerty or Wentz, or did anything to rectify the "mistake" except to urge Welch and Farrar to complete their conveyance of the Canada land.   On the contrary, as late as November 3, 1917, he wrote Hagerty, asking him to have Wentz make a new deed, to correct some alleged error in the first, and said: *"I have all the necessary papers in carrying it out."*   On November 28, 1917, he for the first time admitted that Welch and Farrar had got the Wentz deed, and reported their willingness to put up other property in South Dakota or Nebraska as "security" for their final performance of their contract.   On January 16, 1918, he said he had put the proposition right squarely up to Farrar and Welch, and that everything would be fixed up in the next two days, and that "they will either *deliver you the Canada land or return you your original papers."*   On February 7, 1918, he reported his failure to settle with Welch and Farrar, and renewed the suggestion that Hagerty accept the proposed substituted property for the Canada land.   Finally, in May, a writing was obtained from Welch and Farrar, undertaking to furnish the deed of the Canada land on June 3, 1918, and depositing a deed for the Nebraska land "to be held in escrow" to secure such performance.   The deed so deposited proved to be worthless. Defendant's own estimate of the deal was thereafter stated in a letter to Mr. Hagerty's counsel, saying:

"There is no question in my mind that Welch and Farrar are criminally liable because from the best information I can get the Nebraska land never was and never has been the property of the defendants."

In that same letter, he protested his own innocence by saying that his delivery of the deed was made "in accordance with the written receipts of all the parties concerned."   As a witness on the trial, he does not defend the truth of this representation, or pretend that he ever had the written receipt or authority for such delivery.   Again, as a witness, he swears that he dealt with Hagerty as the supposed owner of the land, and did not know Wentz, or that Wentz had any interest in the property, until the matter was being investigated by the grand jury; and yet the deed deposited in his hands was made by Wentz and wife,

and he had asked Hagerty to get Wentz to make a new deed, and had taken the acknowledgment of Farrar's fraudulent deed to Wentz of a mythical 400 acres of Nebraska land; and it is not open to reasonable doubt that he knew from the beginning that Hagerty was dealing as the agent of Wentz. There is much other confusion and contradiction in the showing made by the defense; and as a whole, it justifies the conclusion that the entire transaction was a gross fraud on the part of the defendants, and that the fairy story of Canada land, like that of the later pretense of ownership of Nebraska land, was a bald fiction, framed for the wrongful purpose of getting the deed from Wentz and converting it and the land represented by it to their own use, and depriving the true owner of his property therein without consideration. It is somewhat significant that neither the man Gregory, who is sought to be made the scapegoat, responsible for the delivery of the deed, nor Farrar, whose fake deed of Nebraska land was taken as security by Hagerty, upon the advice of the defendant, was offered as a witness, and that, while defendant points to Gregory as the real mischief maker, Welch shifts the blame for the failure to convey the Canada land upon Farrar. True, if the defendant took the deposit of the deed in good faith, and subsequently formed a purpose to violate the trust, or if the delivery was made by Gregory or Miss Walsh without defendant's knowledge, consent, or approval, this would probably not sustain a charge of larceny; but if his admitted or proved conduct in the premises is such as to clearly indicate his original unlawful intent to convert the deed to his own use or the use of his codefendants, and for that purpose he either delivered the deed to Welch and Farrar or permitted or winked at such delivery by Gregory or Miss Walsh, the responsibility remains with him. It is immaterial whether he personally made the manual delivery, if in fact he purposely accomplished it through the hand of another. Further discussion of the evidence does not seem to be necessary. The trial court did not err in refusing to direct an acquittal.

II. Counsel appear to argue that, by agreement of the parties, other property was substituted for the alleged Canada land, and that such substitution operated to purge the default of the defendants. It is enough at this point to say that the

record not only fails to show such substitution, but makes it affirmatively appear that it was never made or accepted.

III.   Appellant challenges the eighth paragraph of the court's charge, as amounting to an instruction to the jury that, to justify an acquittal of appellant on the ground that the deed deposited with him was surrendered to Hagerty or to Welch and Farrar without his knowledge or authority, such fact must be shown beyond a reasonable doubt.   We think the language of the court is not fairly amenable to such criticism.   It may, perhaps, be true that the paragraph is unnecessarily long, and embodies some propositions or features which might better have been omitted, or stated in separate paragraphs; but it seems reasonably clear that the jury could not have been misled to the appellant's prejudice.   Abbreviated somewhat in length, the substance of the charge in this respect was that, even though it be shown beyond a reasonable doubt that the deed was deposited with appellant to hold until Welch and Farrar should deliver to Ritchie their deed to the Canada land, the latter could not be found guilty as charged in the indictment if the premature delivery to Welch and Farrar was made without his knowledge or authority.   As so construed, the instruction was not erroneous.

Further exception is taken to the court's instruction upon the question of reasonable doubt, in that the jury was told, in substance, that a reasonable doubt is one which naturally and fairly arises in the mind from an impartial consideration of all the evidence.   The criticism offered upon this statement is that a reasonable doubt may also arise from a *lack* of evidence, and that the jury should have been so told.   It is true that this court has, on one or more occasions (see *State v. Smith*, 192 Iowa 218), expressed its disapproval of an instruction so framed; but we think it has never been held an error of a character which necessitates a reversal.   Indeed, the distinction between the two forms of instruction is somewhat over-refined and shadowy.   A reasonable doubt, arising from the case as made by the evidence, implies an inquiry into the effect of the entire showing in support of the indictment, both its strength and its weakness; or, in other words, what the evidence reveals

2. CRIMINAL LAW: trial: instructions: reasonable doubt: absence of evidence.

and what it fails to reveal.   A juror of average intelligence could not fail to so understand the charge.

The judgment appealed from is—*Affirmed.*

STEVENS, C. J., PRESTON and DE GRAFF, JJ., concur.