[No. 30600. *En Banc.* March 18, 1949.]

THE STATE OF WASHINGTON, *Respondent*, v. ARTHUR BRUCE PERKINS, *Appellant.*[1]

[1]Reported in 204 P. (2d) 207.

*Stanbery Foster* and *Ernest L. Meyer*, for appellant.

*Van R. Hinkle, Ralph R. Gilby, The Attorney General,* and *Frank P. Hayes, Assistant,* for respondent.

ROBINSON, J.—This is a capital criminal case in which the appellant was charged, in a two-count information, with having committed two first degree murders on or about December 15, 1947. The murder of Geneva Jessup was charged in count I, and the murder of her husband, Ed

Jessup, in count II. In each count, it was charged that the alleged murder was committed by beating the victim about the head with a rock and by stabbing with a knife. The appellant, upon arraignment, pleaded guilty to the information, but, upon motion of the attorneys appointed by the court to conduct his defense, was permitted to withdraw that plea and enter a plea of not guilty.

At the close of a long trial, beginning March 15, 1948, and ending on March 23rd, the jury returned a verdict of guilty as to each count, and also the following special verdicts:

"We, the jury, duly impaneled to try the above entitled case, do find that the death penalty shall be inflicted as to count one."

"We, the jury, duly impaneled to try the above entitled case, do find that the death penalty shall be inflicted as to count two."

A motion for a new trial assigning six grounds was filed, and denied in due course. The matter again came before the court on April 8, 1948, as shown by the following minute entry of that date:

"MINUTES OF THURSDAY, APRIL 8, 1948
"COURT IN SESSION    WRIGHT, J., Presiding
"No. C-1361 THE STATE OF WASHINGTON vs. ARTHUR BRUCE PERKINS alias ARTHUR LAMBERT

"This matter came on regularly before the court at 2:00 p. m. for the signing of Judgment and Sentence. The State of Washington appeared by Van R. Hinkle, prosecuting attorney for Thurston County; and defendant, Arthur Bruce Perkins, alias Arthur Lambert appeared in person and by his attorneys of record, Stanbery Foster and Ernest L. Meyer. Counsel having announced they were ready to proceed, Mr. Hinkle informed the court he had prepared an order entitled Judgment and Sentence, to which defense counsel stated they had no objections as to the form thereof. Court informed defendant that he could speak on his behalf, if he so desired, before sentence were passed upon him, whereupon the defendant arose, approached the court's bench and stated that all statements heretofore made by him on the stand during his trial were the truth.

"Court then pronounced sentence as follows: 'The jury, duly impaneled to try this cause, has found you guilty on each count and the court finds that you are guilty, and it is

the judgment of this court that the finding of the jury be confirmed, and on each count you are found to be guilty of murder in the first degree, and the Judgment providing for the death penalty is being signed in your presence.'

"Defense counsel orally gave notice of appeal to the Supreme Court of the State of Washington, and stated they would enter a formal notice in accordance therewith. *Court granted defense counsel's request that the cost of Statement of Facts be borne by Thurston County.* (Italics ours.)

"Signed this 8th day of April, A. D. 1948.

"D. F. WRIGHT
"JUDGE."

The oral notice of appeal was followed by timely filing of the statement of facts and briefs on appeal, and oral argument was heard in this court on October 21, 1948.

The ten errors assigned by appellant have necessitated a careful reading and re-reading of the six hundred thirty-three pages of transcribed testimony given by the more than forty witnesses who testified in the case, as well as an examination of a number of the fifty-eight exhibits admitted during the trial. As a basis for the discussion of the errors assigned on appeal, it will, unfortunately, be necessary to make a rather full factual statement and to quote at length from the oral evidence and exhibits in the case.

The oral evidence establishes that the dead bodies of the Jessups were found in the little house in which they had lived for a couple of years, situated in a well-settled district in Olympia, just north of the state capitol grounds and about a block and a half south of the Thurston county court house, at about four p. m. on Tuesday, December 16, 1947. A neighbor who discovered the bodies relayed the information to sheriff Tamblyn about four thirty, and he immediately went to the scene of the murders with several of his deputies. The Olympia chief of police, with some of his men, arrived at the same time; also, Mr. Hinkle, the county prosecutor, with one of his assistants. The officers made a preliminary examination of the bodies and the premises.

Mrs. Jessup's body was lying on a davenport near the center of the small living room, with some pillows under

her head upon which were large quantities of blood. It was apparent, from a number of jagged head wounds, that she had been repeatedly struck by some irregular-edged instrument. She also had four gaping stab wounds in the vicinity of her left breast, bruises upon her right chest and on her neck, and some cuts on her hands.

Mr. Jessup's body was on the floor of the little bedroom near the bed which he had apparently occupied for some indeterminate time before he was murdered. He was in his night clothes, but his day clothing was on the chair near the bed. His wounds were very similar to those of Mrs. Jessup, but he had, in addition, a wound on his forehead and had evidently received a severe blow on the right eye.

One of the officers discovered, between the cushions of the davenport, a flat bloodstained stone, about the size of a man's hand, but thicker. It had irregular, rather sharp, edges, and weighed about two pounds. Another officer found a butcher knife in the sink, lying on a bloodstained washrag with which, it was thought, the knife had been washed. There were no fingerprints on either of these objects, nor were any significant fingerprints found in a thorough examination of the house made a few days later.

The officers also searched for a considerable sum of money ($117) which, they were informed by a sister of Mrs. Jessup, was kept in the house in a plastic container. This was not found that night, but was found, intact, a few days later by a deputy sheriff while searching the house for fingerprints.

In examining Mr. Jessup's day clothing, which was found on a chair by his bed, the officers noted that one of the pockets of his trousers had been turned inside out. But since there was no indication of breaking and entering, and, so far as the officers could then determine, nothing of value was missing from the house, they adopted the theory that the murders were not committed by burglars but by someone with whom the Jessups were acquainted and who entered the house with their knowledge and permission.

The officers considered it to be of first importance to the state to determine when the crimes were committed. After

some discussion as to ways and means, prosecutor Hinkle summoned, from Tacoma, Dr. Charles P. Larson, a specialist in pathology of long and varied experience, including a term of several years with the American forces in Germany as medical examiner for the war crimes commission.

Dr. Larson arrived at the Jessup house at 6:15 p. m., and spent about two hours examining it and its contents, and in directing the taking of certain photographs which are in evidence. He first made a preliminary examination of the bodies. He arrived at the conclusion that the Jessups had been dead about twelve hours, but frankly stated that, since he had no way of determining what the temperature of the room had been during the day, there might be a fifty per cent error either way in his conclusion, which was based on an estimated temperature of seventy degrees. If the temperature had in fact been higher than that, and there is some evidence in the record indicating that it was, he would have said the Jessups had been dead longer than twelve hours, for the higher the temperature the longer it would have taken for rigor mortis to set in.

According to Dr. Larson's estimate, the murders were probably committed about six or seven a. m., December 16th, or may have been committed as much as six hours earlier or later than that. According to the appellant's pre-trial confessions, which will be detailed later in this opinion, and also according to his oral evidence given when he voluntarily took the witness stand in his own defense, the crimes were in fact committed between two and three o'clock a. m., December 16th. The bodies were moved to undertaking parlors about ten thirty p. m., and Dr. Larson at once began external examination of the bodies, followed by a thorough and complete autopsy, including an examination of all internal organs.

The external examination of the body of Mrs. Jessup showed that she had many head wounds which were inflicted by some such instrument as the rock heretofore mentioned, and four stab wounds in the region of the left breast. These had been made by a knife, with a blade just about an inch in width, which is the width of the knife which was

found in the sink and is in evidence as state's exhibit No. 42. One of the stab wounds was superficial, the point of the blade having been checked by the breast bone (sternum). The other wounds were deep, but not entirely through the body, the knife having encountered the ribs which form the posterior wall of the chest cavity. One, however, had pierced and collapsed the left lung. There were a number of wounds on the head, which Dr. Larson, using photographs of the bodies taken under his supervision and which had previously been admitted as exhibits in the case, described as follows:

"There is one large wound on the right side of the scalp in the back of the head. The others all lie on the left side of the scalp and some of them are seen in the picture. These scalp wounds were ragged, irregular. They weren't the type of wound that is produced by a knife. They are jagged and irregular in shape and they leave pieces of tissue in between the wounds which are not cut across, indicating that the wounds on the head were produced by an entirely different type of instrument than the wounds in the chest. Q. Calling your attention to the exhibit that was displayed to you this morning, the rock, could they be caused by that type of an object? A. They could have been caused by that type of an object. I wouldn't say that they were caused by that object, but they could have been caused by that type of object. Q. Were there other wounds? A. Yes. Numerous bruises over the body. There were some bruises over the anterior surface of the neck. Two of them show in the picture here. (Indicating.) Over the right surface of the chest, there was a wide area about the size of the palm of your hand, if you put it up here (indicating), there was a wide area of bruises in which the skin was discolored. There was small cuts and bruises on both the arms and legs. The most severe of the cuts were on the hand and the cuts on the hand were on the right hand, and they involved chiefly the ends of the fingers, of the middle and index fingers. One of these being almost completely cut off."

Other results of the external examination were of special importance, or at any rate proved to be so before the trial closed. We quote:

"Q. What bruises, if any, did you find, Dr. Larson, in making your external examination? A. I have already described

the bruises. I found a rather large bruise about the size of the palm of my hand over the anterior front surface, over the anterior front surface of the right side of the chest; also superficial bruises on the neck and two small cuts on the front of the neck. The other bruises were on the right hand and there were some bruises on the knees, but they were of minor importance and no great consequence as far as injury to the individual. Q. Doctor, as a specialist of forensic medicine, what did your examination of those bruises, which you have indicated, how could they have been inflicted? A. Well, this is purely a matter of opinion and not one on which I think any one could be certain about. It is my opinion only that the wounds on the head were inflicted with a heavy, irregularly shaped, dull, blunt instrument. Q. Such as the rock? A. Such as the rock. I couldn't say it was the rock. The wounds I think on the, in my opinion, on the hands were inflicted with the same type of instrument as produced by the crushing of the hands between the rock and perhaps the head in an attempt to protect the individual, protect herself against the wounds on the head. Q. If it was a rock? A. If it was a rock, yes. *The wounds on the surface of the chest and right side of the chest, or bruises, I should say, could have been made in an attempt by whoever the assailant was to restrain and hold the individual while inflicting the head wounds, forcibly grasping the shoulders and head of the deceased.* . . .

"Q. Then what is your opinion as to what wounds caused the death? A. In this case it is impossible to say which wound actually caused death. It is my opinion in this case that the individual died purely from the loss of blood and she may have lived for some time after the attack occurred, even as long as fifteen to twenty minutes after the attack occurred. I do not think in this case, death was instantaneous. It resulted from this external and internal bleeding. She may have been unconscious, but at the same time she was still alive for probably fifteen minutes after the wounds were inflicted. Q. Was there anything in the nature of the wounds that you observed, both in the external and subsequently in the internal examination, which would give you any idea as a specialist of this field of what type of instrument was used first? A. No, that would be pure opinion. In the case of the second body, it is absolutely certain which instrument was used first. In this body I wouldn't want to be on the witness stand and say with certainty that one

instrument was used first or the other. In the second body we can be very definite about that." (Italics ours.)

In making the external examination of Mr. Jessup's body, Dr. Larson found, as follows:

"Q. And did that external examination disclose injuries? A. It did. Q. In general what type of injuries did it disclose? A. Generally the type of injuries were very similar as observed on the first body, namely, the woman identified as Mrs. Jessup. On this body there were the same general type of injuries exactly. There were stab wounds in the chest, and multiple ragged, irregular lacerations and cuts on the scalp. There was some bruising of the tissues in the neck and chest. It followed exactly the pattern of injuries on the first body with the exception of the injuries that occurred to this man's left wrist and hand, which were not found on the woman. They are a different type of injury entirely, the left wrist and hand of this man. . . .

"A. I will describe the stab wounds in the chest first. There were five stab wounds in the chest, numbered 1, 2, 3, 4 and 5. Number 1 is the uppermost wound you see in the picture and this particular stab wound struck the first rib. It then was deflected out to the side and did not enter the chest cavity. It struck this rib and run out to the side and cut into only the muscle tissue of the front of the chest, and did not enter the chest itself. Stab wound No. 2 was a similar stab wound which entered the muscles only, also deflected out to the side and did not enter the chest. Number 3 that is below the second wound in the photograph, stab wound no. 3, actually entered into the chest, penetrated the left lung and went through a portion of the actual lung tissue. Wound number 4 was the most important wound of all in the chest. That is the one right near the mid line of the body, the big gaping wound. This entered the chest and also passed directly through the heart and cut holes in all of the cavities of the heart. This wound when it was inflicted must have produced instant death, because it cut large holes in the heart which would be incompatible with life more than just seconds. The external examination of the head disclosed—to be exact, there were ten separate head lacerations, and I determined he had been struck on the head at least ten different times to produce these ten different wounds on the head. These wounds were like the wounds on the other one we have described. They were ragged and irregular as you can see in the picture. They have cut through the scalp. Most of them are on the left

side of the head but there are two of them located on the right side of the head. They were all fairly deep and all had bled considerably, as indicated by the blood beneath the body where it was first found. There was evidence they had bled considerably when I cut into the tissue of the head, because the tissue of the scalp contained considerable hemorrhage. *It is possible to say that the head injuries were inflicted before the chest stab wounds, the reason being that if the stab wound in the heart was produced first, these wounds on the head would not have bled and they have bled considerably, which would indicate the wounds on the head were the first wounds struck. They must have been inflicted before the wounds were inflicted on the chest, because as soon as the heart was stabbed, death would have been almost instantaneous.* The other wound of importance noted in the external examination is the wound on the right hand—let me check that and make sure it is the right—no, the left wrist, the wounds on the left wrist were three in number. Only two of them are shown in the photograph here because the other one was on the inner side of the wrist. These wounds were cutting with a knife. That was determined because of the sharpness of the edges of the wounds and the fact also these wounds went clear down and severed the tendons of the hand. The tendons which enable you to move your fingers were actually cut across, which indicated to me they were inflicted by a sharp instrument such as a knife rather than by a dull instrument used to inflict the head wounds. The head wounds on this individual were a different character than those of the woman in one respect, and that is there was no fracture of the bones of the skull on this man. There were only the lacerations, and tears, in the scalp but no fracture of the bone and no serious damage to the brain which would indicate to me if he had received only the head injuries, he would not have died. It is also possible that an individual with this type of head injury could have regained temporary consciousness between the time they were inflicted and the knife wound in the heart was inflicted." (All italics above used in quoting evidence are supplied to emphasize salient points.)

Dr. Larson's logical conclusion that the murderer inflicted the head wound on Mr. Jessup before he stabbed him was, as will be hereinafter shown, corroborated by one of the appellant's pretrial confessions in which he said, speaking of Mr. Jessup:

"Well, I hit him once in the forehead with my fist and knocked him down and I think I hit him with the rock a couple of times and then I stabbed him."

After the discovery of the murder of the Jessups, it was found that their Chevrolet car was missing. The enforcement officers assumed that the murderer or murderers had used it to get out of town, and police officers of all neighboring towns were notified to be on the lookout for it. It was found parked in front of a Centralia shoestore between seven and eight o'clock on the morning of December 16th, and when reported to the Centralia police, they kept a watch on it nearly all day, but no one came to the car. Late in the day sheriff Tamblyn ordered it impounded in a Centralia garage. He also summoned a fingerprint expert from the sheriff's office in Portland, who came to Centralia with an assistant and, after making a careful examination of the car, reported that it appeared that the steering wheel had been carefully wiped before the car was abandoned and that he could find no fingerprints on it or on any other part of the car. He suggested that the car probably had been abandoned by someone who had in mind that his fingerprints were recorded in some penal institution and was aware of the danger of leaving fingerprints on the car, and recommended that sheriff Tamblyn check on every ex-convict who might have been in or about Olympia at the time of the murders.

Suspicion first fell on a young man in Olympia, of somewhat dubious reputation, who was known to have called at the Jessups' on December 15th. He was picked up and questioned about his activities on Monday, the 15th, the night of the 15th, and the morning of the 16th. He accounted for every moment of his time. His detailed recital was carefully checked and found to be true in every respect. Suspicion then shifted to the appellant, who had been about Olympia on parole from an imprisonment for second-degree burglary, and was known to be a frequent visitor at the Jessup home and to have been in their house on Sunday, the 14th. He had occupied a room in Olympia for

some days, but was not to be found there, nor was anyone found who had seen him in Olympia on the 15th or 16th.

The appellant, Arthur Bruce Perkins, is twenty-two years of age. His mother died when he was about thirteen. He had gone through the grade schools and had attended high school one year. Excessive drinking was the cause of his downfall. At about sixteen years of age, he was out drinking with some other boys, and they broke into a store, for which crime he was convicted and received a six months' sentence to the Lewis county jail and a fifteen years' suspended sentence. When he was about eighteen, he committed the same offense in Olympia, under similar circumstances, and received a fifteen-year maximum sentence to the Monroe reformatory. He soon became a trusty, and his sentence was reduced by the parole board to three years. He escaped from Monroe about thirty days before his term expired. After a short period of freedom, he voluntarily returned to the reformatory, where he was placed in close confinement for several months. He was paroled on November 11, 1947, and went to his father's home near Onalaska for a time, and later came to Olympia. On Sunday, December 14, 1947, Arlie Jones, a bus driver friend of his, got his vehicle mired in the alley near the Jessups' house, and he helped him extricate it. The Jessups came out to hold a light for them. He knew them very well, since they, and particularly Mrs. Jessup, had taken a special interest in him ever since the death of his mother. In fact, Mrs. Jessup had practically been a foster mother to him. He testified: "I called Mrs. Jessup Aunt Neenie."

While Perkins and Jones were working about the bus, a sister of Mrs. Jessup, whose husband was the owner of the vehicle, called the Jessups' home and asked them to call Perkins to the phone, and he went into the Jessup house to answer the call. After taking the phone call, he remained in the house for a time, talking with Mrs. Jessup.

It was the theory of the defense that some things which were said by Mrs. Jessup during that conversation cost her and her husband their lives. While on the witness stand,

appellant detailed the conversation between himself and Mrs. Jessup, as follows:

"A. Oh, she asked me if I had found a job. When I told her I hadn't, not yet, she asked me if I planned on going to work here in Olympia or where I had planned on going to work and I told her that I hadn't found a job and it was then she asked me if I was, if I planned on getting married and I told her that I had, yes, and she asked me if I thought it would be best for me and good to get married and I told her that I didn't know, that I thought it would be, that I loved the girl and she asked me then if I had known what the girl had done while I was in Monroe and I told her I had and she again mentioned something, I couldn't say the exact words, it was something about, 'Well, you know best, you are your own boss, but I think very much of you, I think it would be best if you wouldn't get married to this girl.' Q. Any further conversation at that time with Mrs. Jessup concerning that subject? A. Well, she went ahead to explain in details what had happened during my time up there and that was about all that was said at that time. Q. And what were the details she mentioned? A. Well, that the girl had been married and divorced; several other little things that wasn't too nice, about she was drinking and chasing around in general and I told her I had already known all that, but still it didn't make too much difference to me."

It was known by the enforcement officers that Perkins was accustomed to spend practically all of his waking hours drinking in the taverns of Olympia and nearby towns and their environs, and they thought it would be easy to locate him. They were not only unable to do so, but, for a time, they were unable to find anyone who had seen him in Olympia on December 15th or 16th. They learned, however, that he had been going about steadily with Shirley Phelps, a young woman who lived near Olympia and was regularly employed in an Olympia abstract office. She was brought to the sheriff's office and questioned as to his whereabouts. She answered that she did not know exactly where he was, but that he would arrive at the Olympia bus station on Friday, December 19th, at two p. m., as they had arranged to meet there to go to Shelton to get a license and be married that evening. The sheriff detained her temporarily, fearing

that she might warn Perkins not to keep the appointment. However, he arrived on schedule, and the sheriff arrested him as he stepped from the bus, and first took him to the office of prosecutor Hinkle, where he was questioned at length by the prosecutor and his deputy, Mr. Gilby, but principally by sheriff Tamblyn, who first asked him to state what he had done and where he had been, starting from December 14th and carrying on through several successive days. He did so. Among other things, he stated that, after taking Miss Phelps to lunch on Monday, December 15th, he went to Seattle in the early afternoon, and, after spending some time in various taverns, registered at the Astor hotel; that, at about seven p. m., he went to a tavern and played cards until the place closed at about one o'clock, whereupon he returned to the hotel and went to bed. He also testified that, when on his way from the tavern to the hotel, he got into a fight with a sailor and got some blood on his clothing. He further said that, on the morning of the 16th, he arose about nine-thirty and went to the Moore hotel to see a Mr. Cobley, who had advertised for magazine salesmen. After interviewing Mr. Cobley, he went to a tavern, where he remained for some time, and then checked out of the Astor late in the afternoon and took a bus to Olympia. If this story was true, Perkins could not have been in Olympia when the Jessups were murdered; for he claimed to have been in Seattle from the early afternoon of Monday, the 15th, until the late afternoon of the 16th, and asleep in the Astor hotel from one a. m. of the 16th until nine thirty the following morning. In other words, he had a good alibi.

Referring to the questioning of Perkins on December 19th, the following question was asked the sheriff when he was on the witness stand at the trial:

"Q. Did you or did you not in asking if he had heard anything about an accident around here, ask him whether he had heard of an accident to any of his friends?"

To that question the sheriff made answer, in part, as follows:

"A. Yes, I named over Hazel and Harold Schars, Hazel Schars is the sister of Mrs. Jessup. I knew they were well known to him and I named Arlie Jones and Geneva and Ed Jessup and as—well, first I asked if he was in a jam of some kind and he needed somebody to come and intercede for him, if any of the friends would come over and try to help him out, and he said yes they would and I named them over separately as to Hazel and Harold and then Arlie and then I asked if Ed and Geneva Jessup knew he was in trouble if they would come and try to help him and he said they would. I said they live the closest of any of them, how would it be for me to bring them over and he said, fine, go ahead and then I asked him if he had heard of any accident that happened to any of these people, and he said no he hadn't. I asked him if he—let see—I asked him about this accident and then I asked him if he had heard about anything happening to each one of them separate and he said no, and I asked him if an accident had happened, which one he thought would be the most likely to be in an accident and he said Hazel Schars and Harold. Q. But you did not mention anything about the murders at that time? A. Didn't inform him anything about that at all. Q. And did he or did he not give any indication he had heard of any accident or any murders or anything of that sort? A. He did not. Q. Did you believe his statement he knew nothing of the murders?"

The sheriff's answer to the last question above quoted was stricken on motion by the defense. However, Miss Phelps testified, later in the trial, that, on Wednesday, December 17th, following the murder, she showed Perkins a newspaper account of it in an Olympian tavern.

Perkins was questioned again on the evening of December 19th. He was first asked to repeat the story which he had told in the afternoon. Mr. Hinkle testified that he gave substantially the same account which he had given in the afternoon, but, in addition, admitted that he knew the Jessups had been murdered, having read an account concerning it in the newspaper. On Sunday, December 21st, he was again interrogated by Sheriff Tamblyn, Dr. Larson, Sergeants Williamson and Erickson, chief of police Kelly, and prosecutor Hinkle and his deputy, Mr. Gilby.

When Perkins was arrested, he gave the sheriff a baggage check, and his suitcase was picked up at the Centralia bus depot at Centralia on Saturday, December 20th, by a deputy sheriff. It contained, among other things, a shirt, which appeared to have bloodstains on the collar, and a pair of socks, which were also bloodstained.

Speaking of the interrogation made Sunday evening, the 21st, prosecutor Hinkle testified, in part, as follows:

"A. At that time he was again asked to make a statement of his activities and was advised that his shirt had been recovered and that there was blood thereon. He did not make a substantial change in his story until he left the group and went back to where he was being kept in the rear of the jail and in approximately five or ten minutes came back in and volunteered the statement that he had forgotten a day in his story and he actually had been in the Centralia-Chehalis area on Monday night, December 15th, and Monday morning, December 16th; that he had registered at the Lewis and Clarke Hotel; that he had gone to a tavern or two and met a Mrs. Nelson that worked at Sears store and that he had come back to the Lewis and Clarke Hotel at three or four o'clock in the morning and washed and took a bath and told the room clerk to call him at 11:00 A.M. in the morning; that actually he got up about 9:30 on Tuesday morning and checked out about 1:00 o'clock that date."

It will be noted that, in the recital of his activities during the first inquiry, he said he had been in Seattle the afternoon and evening of December 15th and had gone to bed at about one a. m. on the 16th in the Astor hotel in Seattle, and arose about nine thirty next morning and went to the Moore hotel to see Mr. Cobley concerning a job as a magazine salesman, and remained in Seattle until late in the afternoon.

Another conversation with the officers was held on Tuesday, December 23rd. Perkins was told that a young man named Coffield claimed he had encountered him in Centralia on Monday evening of the 15th and had brought him to Olympia. Coffield was brought into the room, and the following occurred, according to the testimony of prosecutor Hinkle:

"A. Perkins stated that he had been in Olympia on Monday night, December 15th; that he had come over with Coffield to Olympia; had been let out at Roy's place in Olympia about 10:30; that he had gone out to Lodge Springs and come back to Roy's place and had a bite to eat at the Chef Cafe and took a bus from Olympia at 2:00 AM in the morning. Q. For where? A. Centralia and Chehalis area. Q. Prior to the time that he told you during this conversation you have been talking about that he went out to the Meadowbrook—what was the name of the place? A. It is the one out—Maplebrook. Q. During this conversation and prior to the time he told you that, did he say anything about a telephone conversation? A. That he had attempted to get in touch with Shirley Phelps that evening and had failed to contact her and it was thereafter he went out to the tavern, east of the city. Q. Then he told you, as I understand, that he took the bus for Centralia and Chehalis at 2:00 AM? A. As I recall he went to Chehalis and met a friend who had a '38 or '39 Plymouth sedan and they rode around for awhile and in his company and in his car they met Johnny Coffield and his car south of Chehalis and stopped his car in order to recover his hat that had been left in the car when he came over to Olympia earlier that evening. The sheriff at that time pointed out that he had changed his story in that he had said on the first night he was in Seattle; second occasion that he had placed himself in Chehalis and Centralia and now was admitting he was in Olympia and referred to it as a miracle that the overcoat, or rather the shirt, could get blood on it in Seattle when he had already admitted previously that shirt had been checked at a bus station in Chehalis and at that point the defendant stated, 'I do not wish to lie,' as I took the notes, 'I do not want to lie and I can't tell you the truth and that will have to do.' The sheriff asked if that applied to the overcoat and he said it did. At that time I told him as prosecuting attorney I was as interested in seeing this thing cleared up and prove his innocence as to prove his guilt; that each story he told was being checked up on and found to be false and if he was guilty he should come completely clean at this time and clear the whole matter up; not to send the officers on any more wild goose chases as had been done Friday night. I also asked him if—(interrupted) Q. What was his reason for that, Mr. Hinkle? A. He stated we knew he did it, but we would have to prove it. Q. Did what? A. That he had murdered the Jessups. At that time Chief Kelly came into

the room and the door immediately behind me, I was seated at the Chief's desk and I stated that Perkins had virtually admitted the murders to us but that he had stated that he would like to talk to Shirley Phelps first and be the first to break the news to her and I asked the Chief if he would go out and get Shirley Phelps. Q. Did any conversation take place outside the cell then after that, while waiting for Shirley Phelps? A. Mr. Perkins was returned to his cell and I was told he wanted to see me back there at the cell. I accompanied Sergeant Williamson to the cell and he stood about 8 feet away from me and Perkins stated that to me, that he had told us some things in there but he didn't want it to be used; he would make a statement in court and that he would write a letter about how everything happened to me when he was on his way over. Q. Over what? A. He did not state. He said, 'I do not want an attorney.' I told him in a matter as serious as this it would be required that an attorney serve in the matter and he advised me that he would get a, hire an attorney that would work against him. He proceeded then in to talk to Shirley Phelps, in the police courtroom. Chief Kelly, Sheriff Tamblyn and myself were in the room approximately 12 feet from him, from Perkins and Miss Phelps. Miss Phelps facing us and Perkins facing away from us. I did not overhear any conversation other than Shirley Phelps asking him, 'Why did you do it?' I did not hear any answer. They were together about fifteen minutes and I accompanied Shirley Phelps back into the Chief's office where she was crying hysterically and Perkins went back into the cell and was brought out to the outer office where he was cuffed to the officers. I was standing to his left and between Shirley Phelps who was about 12 feet from us and Perkins could hear her crying quite hysterically. MR. MEYER: I ask that the matter about Shirley Phelps crying be stricken. It is entirely hearsay testimony if the Court please. The inference to be created, if I must point it out to the witness, is that the inference they are trying to get across to the jury would be the same as if Miss Phelps were here testifying that Mr. Perkins told her he committed this crime. Miss Phelps is not here and it is clearly hearsay and I ask that it all be stricken."

In this connection, it is but fair to say that Miss Phelps testified later in the trial that Perkins had told her that he had been up to the Jessups'; that he had had an argument with Mrs. Jessup; that he had slapped her; and that was

what she had in mind when the officers heard her exclaim, "Why did you do it?"

The officers had another long talk with Perkins on the evening of December 23rd. Concerning this interrogation, Sheriff Tamblyn testified, in part, as follows:

"A. At that time I told him that I thought that he had killed the Jessups and that I thought he should tell us about it; that he should go ahead and admit it and get it off his mind so he could have some rest and some sleep and feel better about it; that he would be more at ease and—(interrupted) Q. What was his reaction to that? A. At that he said, he straightened up and said, 'Well you fellows know I done it and I might as well admit it but I am not going to give you any details'; said he wanted to talk to his girl before he told anything about it. Q. Then what happened? A. I asked all the other officers if they thought that was okay to bring his girl in and they said yes and we proceeded to send for his girl, Shirley Phelps, and have her brought in. We waited until they brought her back. Q. Just what was it he said that led you to bring Shirley Phelps to the jail? A. He said he wouldn't give us any details, you want the whole thing? Q. Just what he told you with respect that he had committed this crime. A. He said, 'You fellows know I done it and I might as well admit it but I am not going into detail.' He said, 'I want to talk to my girl and tell her about it first.' "

The sheriff also testified that there was further conversation while waiting for Miss Phelps to arrive:

"Q. What was that conversation? A. Well, in that conversation he said that he wanted to get the thing over with. He asked Mr. Hinkle in my presence how he could get this over with and be executed and get it all over with in a hurry and Mr. Hinkle informed him that there had to be a trial in all these cases and that he would have to stand trial; that he couldn't plead guilty, but that he could admit it and sign a confession if he wanted to."

After Miss Phelps had talked to Perkins, he was removed from the police station to the county jail. Sheriff Tamblyn was asked the following question:

"Q. And on your way to the county jail, accompanied by these officers and the accused in your custody, did he, Bruce Perkins, have anything to say at that time?"

He answered, as follows:

"A. Yes, he asked me the same question. I was driving and he was in the back seat and he spoke up rather loud and asked me what my suggestion or what my advice would be to getting this thing over with as quick as possible, get it straightened around and he didn't want to spend any long time in jail; said he wanted to be executed. Q. Wanted to be what? A. Executed. I told him the best thing for him to do to simplify it would be to sign a confession, a short statement of the facts and then hire the poorest lawyer he could find."

According to the state's evidence, the last exploratory questioning of Perkins was had on December 23rd, although various officers, and especially sheriff Tamblyn, talked further with him from time to time.

While in the city jail, Perkins was wearing a wrist watch, which was taken from him on the sheriff's order on February 4, 1948. It was identified, by several witnesses at the trial, as a watch which had been worn by Mrs. Jessup. Perkins told the officers that he had concealed his bloody overcoat at a point near his father's house, some miles south of Centralia, and offered to take them to it. Several days after his arrest, he was taken to the place indicated, but was unable to locate it. On that trip, a chain was fastened to his belt, and the other end of the chain was held by a police officer. He later made the same offer to take the officers to the hiding place of the overcoat, and his offer was accepted. Sheriff Tamblyn testified that, on this occasion, Perkins asked him not to put a man on the other end of the chain and then when he started to make a run for liberty to shoot him.

At some time or another, not specifically shown in the record, Captain R. F. Mahoney of the Seattle police force, a man of long and successful experience as a criminal investigator, particularly homicides, was called upon for assistance. On February 17, 1948, he had a talk with Perkins in the county jail:

"Q. Will you tell the Court and Jury in your own words what took place during the discussion you had with him? A. Well, after a week of investigation I talked to Bruce Perkins. I went to the county jail and the sheriff took me

back to his cell. I was introduced and we were left alone. I told Bruce at that time that we had a very solid case against him; that there wasn't a possibility that anyone could beat it; that the only thing I could see he could do was show a spirit of cöoperation and tell the truth about the whole thing. He talked a little bit and then he finally said if he could talk to Shirley, Shirley Phelps, that he would later talk to me, so I told him I understood he had on numerous occasions made the same request and hadn't later done anything about it, but, and would say nothing about the case, but I said, 'If you want to talk to her, it is all right with me because it doesn't make a great deal of difference and it doesn't make any difference to me whether you tell about it or not and it doesn't make a great deal of difference to the State. I will get Shirley up here and you can talk to her.' I then requested Sheriff Tamblyn to send for Shirley and he sent down to her place of employment, brought her up and she talked to Bruce in the sheriff's office, or main office of the sheriff's department for approximately fifteen minutes. I don't know what was said because we didn't attempt to overhear. Bruce finished his conversation and he and I went back and were locked in the cell and that is the time he said, 'Well, I have never broken a promise, what do you want to know?' I said, 'I want to know the whole thing from start to finish and I don't want you to tell me anything that isn't absolutely true, because everything you say will have to be borne out by the facts as we know them and anything you tell me will have to be true or there is no sense in you making a statement.' He then started in and told me about what happened. I didn't write anything down at that time and went out of the room; told him I wanted to get the Attorney General down there. I asked the sheriff to call Mr. Troy, which he did and Mr. Troy came down and sat in and Bruce repeated his statement. At that time I wrote it down in longhand as nearly as I could get it, every word that he said and then Bruce read the statement in the presence of Mr. Troy and Sheriff Tamblyn and signed it in their presence and then I signed it and then both Sheriff Tamblyn and Mr. Troy signed it. Q. Handing you State's identification No. 50, Captain Mahoney, will you state what that is if you know? A. This is the statement I took on that occasion of February 17, 1948; the statement of Bruce Perkins. Q. And did you or did you not write that statement word for word as he gave it to you in the cell on that occasion? A. I did. Q. Is his signature on that instrument? A. It is. Q. Did you observe Sheriff Tamblyn and myself,

in your presence and in the presence of the accused sign as witnesses? A. I did. Q. Do our signatures appear there? A. They do."

After cross-examination concerning the taking of the statement, it was admitted in evidence as plaintiff's exhibit No. 50, and is as follows:

### "Statement of Bruce Perkins

"When Coffield and his girl left me out of the car at Roy's tavern I called Shirley's home. She was not there and they had no idea where I could get in contact with her. Then I stayed in Roy's place from 10:15 P.M. until 12 midnight. Directly from there I went to the Maplebrook tavern. I was drinking beer. I went there with a boy I went to school with, his last name is Norris. We came back to town in his Chev. Coupe and I left him. I got out again in front of Roy's. From there I went to a little cafe across from the Olympian Hotel and had something to eat. I was feeling good but I was not drunk. From the Cafe I went to the North Coast bus depot. I was there from twenty minutes to a half hour. The bus to Chehalis was not due in for at least a half hour. I bought a ticket & then started walking around. I walked for fifteen or twenty minutes & went to Jessups. When I went there I never *ment* either one of them any harm as I thought of her more or less as a mother.

"I knocked on the door and she asked who it was and I told her. She asked me if I wanted some coffee. I said no. Then she asked my why I wa*sent* in Seattle. I had told her Sunday I was going to a doctor. I then said in a roundabout way it was unnecessary for me to go. She caught on that it was Shirley I was staying for. She started to ask me if we were going to get married and what kind of work I was going to do. I told her I had planned on marrying Shirley. Then she started telling me some things about Shirley. She kept talking about it and I slapped her first. I then realized what I had done and knew I could never face her again. The rock I used was in a flower pot or was used as a door jam. I remember the old man coming into the room and I knew right then I would have to kill him as he saw the whole thing. I think the knife was on the kitchen table or drain board. I don't know how many times I stabbed them. I think I choked Mr. Jessup until he was unco*n*cious and I think I hit him once or twice with my fist and then I remember stabbing him. She was standing up when I hit her and when it was all over I picked her up and put her on the davenport.

"I remember picking the car keys off the table and driving away. This must have been around two thirty or three A.M. Tues. morning Dec. 16, 1947. I drove towards Centralia & picked up a hitch hiker just this side of the airport & took him to Mary's corner. I caught up to Coffield about half way between Chehalis & Mary's corner. I stopped him and got my hat. I can and will show the sheriff where the over coat I was wearing is. The pants I was wearing was checked with the suitcase in Chehalis at the bus depot. The overcoat was pretty well covered with blood but the pants were only stained on the cuffs. The shirt I was wearing is the one the sheriff found in my suitcase that had the blood on it. I left the car in Centralia and went to my hotel room. After I got to the hotel I knew I could not go back to the car. The only thing I used to remove the blood from the shirt was soap & water. I think I tried to remove fingerprints from the car by wiping it.

"I am making this statement of my own free will without any promises or duress being used.

"All this happened on Monday night Dec. 15th or Tues. morning Dec. 16th.

"I forgot to say her watch was lying beside the car keys on the table and I took that.

                [Signed]  Arthur Bruce Perkins
"Statement taken by R. F. Mahoney
"Witness:. [Signed]  Smith Troy
  "     "     [Signed]  Frank C. Tamblyn"

The confession was not only signed by Perkins, but he placed his initials on each of the six pages. On the next day, February 18, 1948, under questioning by sheriff Tamblyn, Perkins again confessed the murders by signing a transcript of the sheriff's questions and his own answers. The transcript is in evidence as plaintiff's exhibit No. 51, and, in words and figures, is as follows:

"STATEMENT OF BRUCE PERKINS, questioned on February 18, 1948, by FRANK C. TAMBLYN, Sheriff, Thurston County, Washington, in the presence of SGT. GEORGE ERICKSON, Detective Division, Olympia Police Department, Olympia; taken down in Shorthand and transcribed by JOHN WAGNER, Deputy Sheriff, Thurston County, Washington:

"Q. Do you want to make this statement of your own free will? A. Yes. Q. There have been no threats or promises made in any way to you have there? A. No. Q. You realize

of course that this can be used against you? A. Yes. Q. When did you come from Centralia to Olympia? A. About 15 minutes after 10:00 p.m. on December 15, 1947. Q. You came with John Coffield and Bessie Fitzgerald in their car? A. Yes. Q. Where did you stop when you first arrived? A. The first place was Roy's Tavern. Q. What did you do there? A. I made a phone call. Q. Was the phone call to a girl here in Olympia? A. Yes. I didn't get the party and Johnny and Bessie went on home. I stayed at Roys until about 12:00 o'clock. Q. Who did you meet there? A. This Norris. Q. What is his first name? A. I don't know. Q. Do you know where he works? A. No, I don't. Q. What do they call him? A. I call him Happy. Q. Do you think he works in a gas station? A. He said he had bought half interest in one, or something. Q. Was he an old school friend of yours? A. Yes. Q. What did you do then? A. From 12:00 o'clock to about a quarter of one we were at the Maplebrook. When we got back at Roys they were closed. He left me there. I went to the Chef Cafe and had something to eat. I went from there to the bus depot. Q. Did you talk to Shorty there? A. Yes, I was there about an hour getting a ticket. I still had some little time—I didn't know how much—before the bus left. Then I walked around for 15 or twenty minutes and decided I would go and see Jessups. Q. Did you go there on just a visit? A. Yes, I had no intentions of harming them. Q. When you arrived there was Mrs. Jessup still up? A. When I arrived there the light was on and it was turned off just as I got there. When I knocked on the door she asked who it was and I told her it was 'Bruce' and she let me in. She asked me if I wanted some coffee and I told her, 'no'. Q. Did she set on the couch? What were the arrangements while you were talking? A. I don't know. Q. Were you sitting on the chair? A. No, I was on the couch. Q. How long were you there visiting with her before anything happened? A. Twenty minutes or half an hour. Well, she asked me why I was not in Seattle, because I told her before I was supposed to be in Seattle. I told her it wasn't necessary and of course she didn't believe me. She asked me if I was planning on getting married to Shirley and what kind of work I was going to do. I told her I didn't know for sure what kind of work. Q. Then did you go on visiting? A. The main topic was about while I was up at Monroe and what was going on while I was up there in regards to Shirley. Q. Did she say something about Shirley at that time? A. That is what I meant. I meant in the

conversation from there on she talked about Shirley and told me what was going on while I was at Monroe. I knew it was true and it didn't make any difference now any way. She kept bringing it up and I slapped her. Q. Where was she at the time you slapped her? A. She had got up to do something and had started walking across the floor. She was in the big chair then and I was on the daveno. Then after I slapped her I realized what I had done and that I wouldn't be able to face her again any way and I lost my temper and killed her. Q. Where did you get this rock? A. It was either in the flower pot or a door stop. Q. Was it close to the front door? A. Yes. Q. Do you remember how many times you struck her with the rock? A. No. Q. You did strike her though? A. Yes. Q. After you struck her did Mr. Jessup start to get up? A. Yes. Q. Did he get to the front room? A. Just to the door way. Q. Tell us what happened there? A. Well, I hit him once in the forehead with my fist and knocked him down and I think I hit him with the rock a couple of times and then I stabbed him. Q. Do you remember where you got the knife? A. I think it was on the drain board or table or something. Q. Do you know how many times you stabbed him? A. No; after I stabbed him I went back and picked her off of the floor and put her on the daveno. Then I took the knife back in and I think I washed the knife and my hands. Q. Did you stab her before you put her on the davenport? A. Yes. Q. All this time you visited with her did you take your overcoat off? A. No. Q. During the process of picking her up you did get quite a bit of blood on the overcoat though? A. Yes. Q. Did you get some on the shirt you were wearing also? A. I think there was some on the collar. Q. Did you try to wash that off? A. Yes. Q. Where did you do that? A. In the hotel room. Q. Did you use soap and water? A. Yes. Q. Was the soap hotel soap? A. Yes. Q. When you got ready to leave did you pick up some things? A. The car keys and her watch were on the little table—I think it was near the telephone. That was all there was. Q. Did you put the watch on your wrist? A. No, I put it in my overcoat pocket with the keys. Q. Did you turn the lights off too? A. I don't remember. Q. Where was the car parked at that time? A. In front of their door. Q. Then what did you do from there on? A. From then on I got in the car and started driving towards Centralia. Q. Did this all happen on the night of December 15th and early morning hours of December 16th, 1947, in Olympia, Washington, which is in Thurston County? A. Yes.

Q. About what time was that that you left there, do you think? A. It must have been somewhere between 2:30 and 3:00 o'clock. Q. You had arrived up there at about a quarter of two then? A. It must have been after two. I might have been though; I don't remember. Q. Did you meet anybody or pick anybody up? A. I picked up a hitch hiker close to the airport. Q. What kind of a fellow was he? A. I think he was discharged out of the Army. Q. Was he a young fellow? A. Yes. Q. Was he dressed in a uniform? A. He had ordinary civilian clothes and a jacket and a pair of slacks. He had an overseas cap on. Q. Do you know whether he was dark or light? A. No. A. Did he drive? A. No, I drove all the way. I took him as far as Mary's Corner. Q. Did you meet anybody? A. I stopped Johnny. Q. Did you drive directly down there? A. Yes. Q. When was that? A. It took me about half an hour to get from Olympia to Centralia. It was probably about 4:15 when I stopped Johnny. Q. You drove directly from there after leaving him off at Mary's Corner to the road leading to your father's place? A. Yes. Q. About half way down that road did you dispose of that coat? A. Yes. Q. Did you get out of the car? A. Yes, I rolled it up and threw it over the fence. Q. The pants you wore did you get any blood on them? A. There was some of the cuff. Q. Where are they now? A. At the Chehalis Bus Depot. Q. What kind of a container are they in? A. They are in a paper sack. Q. When did you leave them there? A. I don't remember. I tried to figure it out before. It must have been sometime Tuesday. Q. You didn't have them cleaned? A. No. Q. You don't remember on the rock whether it was on top of a bucket or whether it was on the floor? A. No, I don't. Q. But it seems in your mind that there was something about a flower pot? A. Yes. Q. Did you have any conversation with Mr. Jessup while you were there? A. No. Q. He was already in bed when you got there and stayed there until this happened? A. Yes. Q. Did you get your hat out of Johnny's car when you stopped him? A. Yes. Q. Where did you return to after disposing of the overcoat? A. I drove the car to Centralia and parked it and went in the hotel. Q. How far from the hotel did you park? A. A couple of blocks I imagine. I don't know for sure. Q. Did you make an attempt to wipe the interior of the car off? A. I think I wiped the steering wheel off, yes. Q. Did you do that as you left the car? A. Yes. Q. What time of the morning would that be? A. About 6:00 o'clock I imagine. Q. Could you tell us what kind of a car that was? A. It was

a black Chevrolet coupe. Q. Do you know what year? A. No. Q. Was it an old model? A. Fairly old.

"SIGNED: Arthur Bruce Perkins

"WITNESS:
   Frank C. Tamblyn
   Geo. V. Erickson
   John Wagner"

The defendant's confessions, both oral and in the above-quoted writings signed by him, were made after the many discrepancies in his stories had been pointed out to him and the enforcement officers had demonstrated that they had evidence which would completely destroy the alibi he had attempted to set up on the night of his arrest, by proving that he was not in Seattle on the afternoon of December 15th and that he did not spend the night of the 15th in the Astor hotel in Seattle, but, in fact, that he spent the early evening of December 15th in taverns in and about Centralia and Chehalis with John Coffield and Bessie Fitzgerald, a girl friend of Coffield, and that they transported him to Olympia about ten-thirty that evening and left him there; and furthermore, that he could not have been in Seattle on the early morning of the 16th, since, at about one-thirty a. m. of December 16th, he, while driving a Chevrolet car, of the type of the Jessup car, overtook and stopped Coffield on the Pacific highway some ten or fifteen miles south of Centralia. It must have greatly alarmed him when he was confronted by Coffield at one of the interrogations. Although Coffield made no statement at the time in Perkins' presence, he had been brought into the room by the officers, and that must have convinced Perkins that the enforcement officers were in a position to destroy his alibi.

In representing to Perkins that they had ample evidence to destroy his alibi, the officers were not deceiving him. Both Coffield and his girl friend testified at the trial that they had met Perkins in Centralia early in the evening of December 15th, and had brought him to Olympia and left him there about ten or ten-thirty that night, and Coffield testified that Perkins, driving an old Chevrolet coupe, similar to the picture of the Jessup car which was shown to him

as he testified, stopped him on the Pacific highway south of Mary's Corner, about one-thirty a. m. on the morning of the 16th, a fact, however, which Perkins had himself admitted to the officers prior to the trial.

Mr. and Mrs. Cobley also appeared at the trial, and both testified that Perkins interviewed Mr. Cobley at the Moore hotel in Seattle concerning employment as a magazine salesman, not on the forenoon of December 16th, but the forenoon of December 17th.

A clerk of the Astor hotel testified that Perkins registered there under the name "Arthur Lambert" (an alias which Perkins admitted he sometimes used), at 8:20 p. m. on December 16th. A certified copy of the register, covering December 16th (exhibit No. 52), shows an entry reading as follows:

"Arthur Lambert, Olympia, Wash. Time of Arrival, 8:20 p. m."

This, however, was of slight importance, since Perkins had admitted, during some of his conferences with the enforcement officers, that he had been mistaken in saying he went to Seattle and registered at the Astor hotel on the afternoon of December 15th.

The foregoing recital fairly well covers, in fact rather too completely, the evidence adduced in support of the state's case, but it remains necessary to outline the defense, which was of a most bizarre and surprising character.

There was no direct repudiation of, or attack upon, the confessions, no protestations of innocence, and no attempt to alibi; but, in the face of a number of explicit confessions, both oral and in writing, signed by Perkins, he voluntarily took the witness stand and testified, in effect, that Shirley Phelps, the girl he intended to marry on December 19th, singly and alone, murdered his old friends, the Jessups, during the early hours of December 16th, and that so great was his love for her that he confessed that he committed the Jessup murders in order to shield her.

In the second of the two confessions signed by Perkins which have been hereinabove quoted, Perkins described

his movements in the closing hours of December 15th and the early hours of December 16th, as follows: When he arrived at Olympia with John Coffield and Bessie Fitzgerald about ten p. m., they went to a tavern. He attempted to reach Miss Phelps by telephone, but she was not at home. Coffield and Miss Fitzgerald left him at the tavern, and he remained there until about twelve. He then encountered an old school friend, and they went to another tavern, east of Olympia, and remained there until about one a. m. of the 16th. They then returned to the tavern where they had met. It was closed. He went to the Chef Cafe.

"I went from there to the bus depot. I was there about an hour getting a ticket. I still had some little time—I didn't know how much—before the bus left. Then I walked around for 15 or twenty minutes and decided I would go and see Jessups."

He knocked on the door and told Mrs. Jessup who he was. She let him in, and she severely criticized Shirley Phelps' conduct while he was in prison. "She kept bringing it up, and I slapped her." At that point, he began the vivid account of his first killing Mrs. Jessup, and then Mr. Jessup, and then told of taking a watch and the keys to the Jessup car, and taking the car and starting to leave Olympia. There was no hint in any of his confessions of the presence of Shirley Phelps at the Jessup house, but when he voluntarily took the witness stand in his own defense, he first related some of his experiences at the Monroe reformatory, told of his helping Arlie Jones with his mired bus on Sunday, December 14th, and of his talk with Mrs. Jessup that day in the Jessup house when he entered it to answer Mrs. Schars' telephone call, and visiting several taverns with Miss Phelps and several other people that night, and of spending Sunday night with Arlie Jones at the Olympian hotel and having luncheon with Miss Phelps on Monday, the 15th, and, after she returned to her work, of his then taking the bus to Centralia, arriving at about three o'clock, visiting a couple of bars and taking a room at the Lewis and Clark hotel at about four p. m., going to Chehalis soon after and the meeting with Coffield and his girl friend, and of going from bar

to bar with them in and about Chehalis and Centralia, and finally to Olympia, arriving at about ten-thirty. He then testified that his confessions were utterly false, and that Shirley Phelps, singly and alone, murdered the Jessups between two and three o'clock on the morning of December 16th. He introduced that part of his testimony by stating that, shortly after ten-thirty p. m. of the 15th, he left his favorite bar in Olympia and went to the Roundtable Club, hoping, and rather expecting, to find Miss Phelps there. His testimony as to subsequent events is of such vital importance that we feel it necessary to quote from it at great length:

"Q. Why did you believe she might be at the Roundtable Club? A. Because the previous week I had given her, or she had my membership card, script book to the Club. Q. You got to the Roundtable Club approximately what time? A. Approximately twenty minutes until ten—I mean to eleven, shortly after ten-thirty. Q. And how long did you stay there? A. Possibly twenty minutes or twenty-five minutes. Q. Did you see Miss Phelps there? A. I did. Q. Did you talk with her? A. I did, yes. Q. What was the conversation? A. As soon as I saw her I asked her if and who she was with and she told me at the time she was with another party and that she would rather, she would see me later on instead of then and I asked her if or when she could break away from the other party and she stated not until the Club was over or shortly after the Club was over and it was at that time that I mentioned seeing her at the Chef Cafe. Q. You mean you made arrangements with her at that time? A. Yes sir. Q. To see her at the Chef Cafe at any given time? A. No, there was no special time. It was just after the bars had closed. Q. You were going to meet her then that evening? A. Yes sir."

After that he told of going to the Chef Cafe. He further testified as follows:

"Q. About what time did you get to the Chef Cafe? A. Approximately one o'clock. Q. And what did you do there? A. Well, I was waiting, the main reason in going there was to wait. Q. How long did you have to wait, how long did you wait at the Chef Cafe? A. Approximately an hour. Q. Who did you see then in an hour? A. Miss Phelps. Q. Was anyone with her when she came there? A. No sir. Q. What

did you do when Miss Phelps came? A. We took a booth and I mentioned the fact, I asked her what took her so long. Before that she asked me how long I had been waiting and I told her approximately an hour and I asked her what took her so long to get there and I mentioned that it shouldn't take an hour or whatever time the club closed to get from the club to the cafe and she was, I would say, in a bad humor at that time and she told me it would be advisable to mind my own business. Q. Had she been drinking? A. Yes sir. Q. What did you do then? A. Well, I, that made me pretty warm also under the collar and we had a small argument. Q. What was it about? A. She had asked me that, if any of my so-called friends had been advising me against getting married again. Q. And what did you say? A. I told her that very close and dear friends thought best of it that I hadn't and I thought maybe they was possibly right and maybe I shouldn't. Q. What was her response to that? A. I don't recall, she made some haughty retort, but I don't remember the exact words. Q. Were any names mentioned about who these friends were that advised you not to get married to her? A. Yes sir. Q. What names were mentioned? A. Mrs. Jessup, or Aunt Neenie. Q. What, if anything, did Shirley have to say about Mrs. Jessup? A. Said something about that it should not be any of their business or anyone else's business, that I was of age and I was free, under no obligation to anyone and that it was also the same with her; that we shouldn't have anyone advise us on anything like that; that it was no one else's business. Q. How long did you stay at the Chef Cafe? A. Approximately 20 minutes. Q. When you left the Chef Cafe did Miss Phelps go with you? A. No sir. Q. When you left the Chef Cafe you were on friendly terms with Miss Phelps? A. No sir, not exactly. Q. Well, tell us about it. A. I mentioned the fact right before I left I thought I would catch a bus and go back to Centralia and she said it would probably be best if I did. As far as she was concerned I could stay there in Centralia. Q. And then what did you do then after she told you it was best for you to stay in Centralia? A. I left the Chef Cafe. Q. Where did you go? A. I went across Washington Street, up to the corner of where the Olympian Hotel is, the corner of Washington and Legion Way. Q. What did you do there? A. I stayed there with the intentions of following her and see who— I had in mind she might stay with somebody in town that night. Q. And did you observe Miss Phelps coming out of the cafe? A. I did. Q. What time approximately? A. It was a very short while after I came

out, possibly three or four minutes after I came out. Q. What time was that about? A. It was about twenty minutes after two when I came out and it was possibly twenty-four or twenty-five minutes after two when she came out. Q. Where did she go when she came out of the Chef Cafe? A. She walked on south Washington Street. Q. Where did she go? A. To the bus station. Q. What did she do there? A. I don't know. I couldn't see her in the bus station. Q. How long was she in the bus station? A. Very short while, two or three minutes. Q. When she came out which exit did she use? A. The north I believe it would be, the one next to the park. Q. And where did she go? A. She went over to Washington Street. Q. And then which direction did she go from Washington Street? A. South on Washington. Q. Then where did she go? A. Thirteenth Avenue. Q. Did you follow her? A. I did. Q. How close were you to her? A. Approximately a half a block, maybe three-quarters of a block. Q. All right. You got to Thirteenth Avenue then what happened? A. She went to Mr. Jones' apartment, upon the porch. Q. Did she go in? A. No sir. Q. What did she do? A. I couldn't see. I took it for granted at the time she knocked on the door, but I couldn't see whether she actually did or not. She was at the door possibly a couple of minutes on the porch. Q. Where were you when she was at the door? A. I was across the street. Q. What did she do after leaving the porch? A. She went off the porch and around the side of the apartment, Mrs. Smith's apartment. Q. In which direction was she going then, toward the front or back of the house? A. Back of the house. Q. Where did she go then? A. I couldn't see where she went then because I was across the street. Q. Where did you go? A. I came up to the side of the apartment also. Q. Did you see Miss Phelps then when you came up to the side of the apartment? A. No sir. Q. What did you next observe? A. The lights. I couldn't see the doorway from where I was at. Q. What doorway? A. Mrs. Jessup's and Mr. Jessup's. Q. What lights could you see or couldn't see? A. I couldn't see the door, but I did see the lights from inside the house reflecting off the car. Q. What car? A. Mr. and Mrs. Jessup's. Q. Where was that car? A. Directly in front of the doorstep. Q. Then what happened? A. Well the door closed and I took it for granted she was in the house. Q. And where did you stay? A. At the corner of Mrs. Smith's apartment. Q. How far would you say that was from the front door of the Jessup house? A. I couldn't say exactly, possibly 25 yards, I couldn't say exactly. Q. How long did

you stand there? A. I was there possibly fifteen minutes. Q. Then what happened? A. I heard a scream at that time. Q. You heard what? A. A scream. Q. What did you do? A. I ran over to the apartment, or their house, small house. Q. Did you get in? A. I tried to get in, yes. Q. Why couldn't you get in? A. The door was locked. Q. What did you do? A. I called her name. Q. Whose name did you call? A. Miss Phelps'. Q. You didn't call her Miss Phelps did you? A. No, I called her Shirley. Q. Then what happened? A. The door was opened by her. Q. What did you see? A. Well, as soon as I stepped in the door she started to scream. She was in hysterics. Q. What did you do? A. I slapped her face at that time. Q. Where was she when you stepped into the room and slapped her? A. She was to the right of the door, or possibly in front of me which would be to the right of the doorway. Q. What if anything did you observe about her? A. Well, she had a knife in her hand at the time. Q. Where was Mrs. Jessup? A. On the floor, on the living room floor. Q. What did you do? A. At that time I told the girl to go wash her hands and I went over to look at Mrs. Jessup to see if she was still living. Q. What did you do then? A. I picked her up and laid her on the davenport, on the couch. Q. Then what did you do? A. Well at that time I never really realized, it was such a shock, I don't know, until I picked her up I couldn't really realize the extent of the tragedy and I got scared then and I asked, I noticed that she had not washed her hands and I took her in and washed her hands and also washed the knife off. Q. Did you go in to see Mr. Jessup? A. I did, yes. Q. Then what did you do? A. I turned his right, I believe it was his right pocket wrongside out. Q. What was the purpose of that? A. To make it look like it was a robbery. Q. Then what did you do? A. I picked up the car keys and the watch was lying beside the car keys, I picked both up and put them in my overcoat pocket. Q. Then what did you do? A. I got her coat, Miss Phelps' coat. Q. Where was her coat? A. It was laying on the end of the davenport at the foot end of the davenport. Q. You laid Mrs. Jessup up on the head end of the davenport. A. Yes. Q. The opposite end then of the davenport? A. Yes. Q. Then what did you do? A. I put her coat on and I believe I turned the lights off, I don't know about that, but I went out and unlocked the car door and then I brought Shirley out and put her in the car. Q. What was her condition at that time? A. Well, she was a little better I would say than when I found her. She was still crying, but not as bad and not in such a hysterical mood.

Q. How long was it from the time approximately that you stepped into the door of the Jessup house until you left the Jessup house in the car? A. That would be very hard to say. I would judge approximately ten minutes. Q. Where did you go when you put Shirley in the car, how did you leave the Jessup driveway there? A. I went up the alleyway which would be west on the alleyway. Q. Toward the high school? A. Yes. Q. Then what did you do? A. I turned right and went onto 13th Avenue. Q. And then what did you do? A. Turned left and went on up to Capitol Way. Q. Where did you go? A. I drove down past the bowling alleys which was on Capitol Way and turned left, I don't remember what street it was, shortly after I passed the bowling alleys, over to Columbia Street and I went down Columbia Street to 4th Avenue, corner of 4th and Columbia I believe it was. Q. What happened there? A. I had asked her on the way down if she was able to take a taxicab home; that I explained to her I would take her home, but I didn't want to, because I wanted to get the car out of town before it was noticed and I was afraid that somebody might have seen us leave the place. Q. And where did you leave Miss Phelps? A. On the corner of 4th and Columbia Streets. Q. Tell the jury whether or not there was any arrangement about how she was to get home? A. No sir. I took it for granted, I told her to get a taxicab and I just took it for granted she would. Q. You let her out of the car there at 4th and Columbia? A. Yes sir. Q. Where did you go? A. I went across 4th, down to State Street. From State Street I turned onto Capitol Way and left town. Q. Went out on the south Pacific highway? A. Yes sir, it would be south Capitol Way."

He further testified that he then drove on through Centralia and Chehalis and overtook Coffield near Mary's Corner, and stopped him to recover his hat, which he had left in Coffield's car when Coffield took him to Olympia. He then threw his bloody overcoat away in a tangle of blackberry bushes and went to his father's place to get some clean slacks, because his trousers were also stained with blood which got on them when he picked up Mrs. Jessup's body and placed it on the davenport. He then went back to Centralia and parked the Jessup car in the street, and went to his hotel room and spent some time attempting to wash the blood from his clothing, and, after visiting several bars,

he returned to the hotel, checked out, and took a bus to Seattle, arriving there at three p. m., and, after visiting several bars, registered at the Astor hotel. At about four p. m. on that afternoon, he called Miss Phelps and arranged to meet her at his favorite tavern in Olympia on Wednesday evening, the 17th.

"Q. What was said at that time? A. I asked her how she was. I couldn't talk very much about anything, being it was a long-distance call and I was afraid the operator would be listening. I asked her if anything had come out in the newspapers, if any questions had been asked and that was about all at the time."

He testified:

"A. The general topic all through the tavern was about this tragedy and it was brought up by the fact Mr. Smith, I believe his name was, and Shirley asked me if I had heard about the tragedy and I denied the fact then in front of this other couple because I had been out of town and told them I had been out of town and she got a paper or clipping, one, I don't remember which it was and I read it."

After visiting several other bars, they went to a hotel.

"Q. Did you have any conversation there with Miss Phelps about this matter? A. I did, yes sir. Q. Tell the jury what the conversation was. A. Well, I asked her why she had been up here to the courthouse. I thought maybe they might, the officials, might have suspicioned that one of us had had something to·do with the tragedy. She told me at the time, as far as she knew they did not suspicion either one of us and she was talking to Mr. Levesque and he was inquiring as to my whereabouts. I asked her then about her alibi, if she had established a good alibi. She said she had and that I didn't have to worry about her alibi, or her getting mixed up in it. Q. You asked her at that time about her clothes? A. I told her that if she had any blood on her clothes to burn them. Q. What response did she make to that? A. Practically the same response. She told me that she would take care of herself; that she, for me not to worry about her getting mixed up in any way."

On Thursday, the 18th, he went to Chehalis about two p. m. While there, he called Miss Phelps by phone:

"Q. About what time did you call her? A. About four-thirty. Q. What was the nature of that conversation?

A. I called her up to tell her where I was at and she told me that they had suspicioned a young man, a parolee from Monroe. She said it didn't give the name in the paper, but gave my description, might as well give my name, everybody knew who it was; for me not to come around Olympia and I asked her then if she could come down there that evening. She said she would. Q. And how was she to come down? A. I told her distinctly not to bring a car down, for her to get a bus, because I was afraid they might be watching the roads. Q. At what time did Miss Phelps arrive in Chehalis? A. About six, possibly a little after six. Q. Then where did you go? You met her then? A. Yes. Q. At the bus station? A. Yes sir. Q. Where did you go then? A. To the Midway tavern. Q. That is the same one you had previously visited on Monday night half-way between Centralia and Chehalis? A. Yes sir. Q. How did you get out there? A. By taxi. Q. How long did you stay there? A. Possibly two hours or two hours and a half. Q. Did you have any conversation then with Miss Phelps about this matter? A. I did, yes. Q. What was the nature of that conversation? A. I asked her again about her alibi and at that time we was talking about getting married and we established the fact that we would get our license Friday."

Miss Phelps visited Perkins on several occasions after he was transferred from the police station to the county jail.

"Q. And what was the nature of those conversations that you had with Shirley when she would come to visit with you? A. Well, it was—she would ask me if—in the early part, I believe it was the first time she came to see me, she asked me if I was going to sign a confession. I don't remember the exact conversation, but it pertained to signing the confession and that if they suspected anybody else. Q. Was that the first time you had any conversation with her about a confession? A. I believe so, yes. Q. Who brought that up, you or Shirley? A. I believe she asked me if I was going to sign a confession. She had known already that I had given an oral confession. Q. And what was your answer to that when you were asked if you were going to sign a confession? A. I told her at that time that I wasn't. . . .

"Q. Upon that occasion of the third visit at the county jail did this matter come up under consideration, did you discuss this at all? A. Yes, we discussed it. Q. What did you say about it, what was said about it at that time? A. I mentioned the fact I was going to confess and sign a con-

fession. I believe that was the time. Q. And what did she say about that? A. And I told her that they had quite a bit of evidence against me and that I might as well confess and that way maybe they would stop working on the case and that she wouldn't have anything to worry about at that time.

. . .

"Q. Bruce, will you tell this jury why you signed those confessions? A. Yes I will. It was to keep Miss Phelps out and I knew I was not the guilty one and I didn't think at the time I would be brought to trial for it."

Some excerpts from the cross-examination of the defendant are quite pertinent:

"Q. How close were you to the Jessups and particularly Mrs. Jessup? A. Very close. Q. Did you or did you not regard Mrs. Jessup with similar affection to that of a mother? A. I did, yes sir. Q. And you went ahead and made plans after this individual, so you claim, killed a person almost as dear to you as your mother and made plans to marry her, is that correct? A. I did, sir. Q. Will you explain if you can why if it was your plan to protect Shirley Phelps to the extent you jeopardized your own life or your own liberty for the rest of your natural life up to that point that you now have a change of heart and are pointing the finger of accusation to her? A. Well, I felt that I helped her out all I could and also from different sources she did not appreciate the fact of what I was doing, because I found out from different sources that that didn't slow her down too much in drinking and running around with other people while I was in here taking her charge."

On cross-examination, Perkins also testified that Miss Phelps left the Chef Cafe close to two thirty, and then, as follows:

"Q. And then you stayed out of sight and watched Shirley's activities? A. Yes. Q. Where did she go? A. First to the bus depot. Q. How long did she stay at the bus depot? A. She was only in there a couple of minutes. Q. Then where did she go? A. South on Washington to 13th Avenue. Q. And about what time did she arrive at 13th Avenue? A. Oh, I couldn't say exactly. I imagine close to two-thirty. Q. Then where did she go at the time she arrived at 13th Avenue? A. On the porch of a small apartment of Mrs. Smith. Q. And how long did she stay there? A. Very short time. Q. Did she talk to anyone there? A. No sir, the door

was not opened. Q. And where did she go from that porch? A. She went around the side of the apartment and from there I couldn't see her any more at that time. Q. Did she go immediately to the Jessup home then? A. I imagine at that time she did. Q. What time in the morning do you think this was? A. Approximately I would say twenty-five minutes to three o'clock. Q. Twenty-five minutes to two o'clock? A. To three. Q. I am sorry, I can't hear you very well. A. To three o'clock, would be my best estimate. Q. Did you hear her knock at the door? A. No sir I never. Q. How close were you to all this? A. I was across the street. Q. How far away would that be? You mean across the alleyway? A. Across 13th Street on the opposite side of the street. I would judge approximately forty feet, I couldn't say exactly. Q. Well, did you expect at that time that she was going there to give your friends the Jessups some difficulty and a little unpleasantness? A. No sir I never. Q. How long would you say she was in the Jessup home before you heard the scream? A. Possibly fifteen to twenty minutes. Q. And the first outcry you heard was some fifteen or twenty minutes later? A. Approximately, yes. Q. Where were you then? A. I was at the corner of Mrs. Smith's apartment across the alley from the Jessup's home. Q. Can you or can you not see the entrance of the Jessup home from that place? A. You can not. Q. How long were you in the Jessup house after you heard the outcry and rushed in there? A. That would be very difficult to say. I would say I was in the Jessup house possibly ten minutes, it would be hard to say. Q. How closely did you look at the two bodies? A. Mrs. Jessup very close, because I had her in my arms. Q. You noticed the large number of wounds? A. Yes sir. Q. You also noticed the wounds on Mr. Jessup? A. I could see that he had been beaten and stabbed. Q. If she was in there twenty to twenty-five minutes until you first heard the outcry, don't you think there was an outcry before that? A. It is possible, but I never heard it. Q. Will you tell the Court and Jury again just how you picked Mrs. Jessup up, about that phase of it? A. Well, I looked at Mrs. Jessup first to see if she was still living, any possible chance she was still living, then I picked her up and laid her on the davenport. Q. You just picked her up and laid her on the davenport. That is all the handling of Mrs. Jessup that took place? A. Yes sir. Q. Was she dead at that time? A. Yes sir. Q. Was Mr. Jessup dead? A. Yes sir he was. Q. You didn't think of calling a doctor to see if possibly there was

some sign of life? A. It was beyond any doubt there was any life. Q. So then I understand you helped clean up the place to get rid of fingerprints and whatnot, then in the next two or three days you planned to get married? A. That is right. Q. You had no qualms about marrying a murderess? A. I loved her. Q. Let's see, did I understand your story correctly when you met Johnny Coffield earlier that afternoon or evening preceding this morning you stopped—you just met Coffield for the first time? A. Yes sir. Q. And you then met Bessie Fitzgerald for the first time? A. Yes sir. Q. And you stopped at some third person's house for a blind date? A. Yes sir. Q. How did Shirley Phelps get into the house that night to commit this horrible crime, or these horrible crimes? A. I couldn't say, because I didn't see her walk in the house, but I took it for granted she told Mrs. Jessup who she was. Q. At three o'clock in the morning? A. About twenty minutes until three. Q. And you still want this Jury to believe that you have told all this story, two confessions, admissions to all of these officers, that you committed this crime, that you wanted to hang and wanted the rope and wanted to get it overwith, you want this Jury now to believe that story is all a lie and you told all those lies just to protect Shirley Phelps? A. Yes. The story I am giving now is true. Q. On two occasions you signed written confessions telling in detail how you committed these crimes? A. Yes sir. Q. You hid your overcoat because it had blood on it? A. Yes sir. Q. You lied to the officers about where you were, giving alibis about being in Seattle and when that broke down you said you were in Centralia at that time? A. Yes sir. Q. As those broke down you finally admitted those were lies and finally admitted you had done this thing? A. I did sir. Q. And now you want this Court and Jury to believe that it was as an afterthought now that this girl committed these two horrible murders; that you knew about it; that she killed, among other persons, a person you loved as dearly as your own mother and in the next few days you were planning to go to Shelton and marry her? A. Yes, I loved the girl."

Miss Phelps was, of course, not on trial, but if the trial had closed after Perkins left the witness stand, the jury might possibly have believed the fantastic story which constituted his sole defense.

The bloody overcoat which Perkins had worn at the time of the murders, his shirt, his bloodstained trousers and socks

were examined by the F. B. I. laboratories, and the blood was found to be human blood, both by the F. B. I. and independently by Dr. Larson as well. Perkins had attempted to explain away the blood by saying that it got on his clothing by his brushing against Mrs. Jessup's dead body.

Dr. Larson was recalled by the state and testified as follows:

"Q. Handing you State's exhibits 40 and 41, directing your attention to them, Doctor, you made an examination of that clothing I believe relative to blood? A. Yes I did. Q. Will you tell the Jury and base your answer upon your experience in this field upon the examination that you made of the clothing you now have there whether the appearance of blood that you found would be what you would term blood splattering or brush marks? A. The spots on the coat are what I would term blood splattering and not brush marks. I say that because the places where the blood lay were very tiny and small. They were scattered out at a very wide distance from each other and there is no one place where there is any great accumulation of blood such as you would have in a brush mark, where the blood was considerable amount in one place and brushed up against a mass of blood. Q. Will you explain to the Jury just what is the difference between blood splattering and brush marks? A. Well, blood splattering is something that any physician who is in surgery observes very frequently and I observe it several times a week. When you cut a large blood vessel, particularly an artery or small artery even for that matter, the blood spurts out of this artery with each beat of the heart and depending on the size of the artery it throws out varying size splashes of blood and splatters them at some distance away. That is what I call blood splattering. Brush marks are something as far as blood is concerned are spots that are made when somebody rubs up against a mass or pool of blood and its appearance on clothing is considerably different when you have contact brush marks against blood. When it is due to splattering of blood, either from a cut blood vessel or somebody throwing blood around or striking something which splatters the blood in small droplets. Q. The coat then has what kind of blood markings? A. It would seem from examination here when I first saw the coat the great majority of these spots were small droplets which we would call splattering of blood. Q. What can you say in respect to the trousers in the same

connection? A. The trousers are somewhat similar except down around the legs where there are some larger spots that could be called brush marks. Here is one here on the cuff of the trousers that can be called brush marks. It is a much larger spot of blood which would be probably coming into contact directly with blood on some other object, but aside from the lower part of the cuffs on the trousers, even on the trousers most of them are blood splatters instead of brush marks. Q. And assuming Dr. Larson that Mrs. Jessup was lying dead on the floor of her home and the defendant here came in to the house and found her lying there dead and picked her up and placed her' on the davenport, or daveno, what would be the type of blood markings that would be on his clothing under those circumstances? A. I think it would make a considerable difference whether the person were alive or dead. If the person were dead obviously there is no blood vessel which is spurting blood. You could pick up a live person who had blood spurting out of a blood vessel and it would splatter blood considerably. However, if that person has no heart action there is no arteries pumping out little droplets of blood. Under those circumstances I would think it would be more likely that blood of this type as you described would be produced when the person was alive. Q. In other words, it is unlikely it would occur, blood splattering would occur from lifting a dead person? A. Anything can happen. I would say it is unlikely it would occur that way."

On cross-examination by defense counsel, Dr. Larson testified, in part, as follows:

"By Mr. Meyer: Q. Doctor, in explaining to the Jury the difference between blood splatterings and blood brush marks, you used the example which you have seen frequently in performing operations, about the spurting of blood from a severed artery. You weren't attempting to infer were you Doctor that the blood spots on that coat could come from that manner and that manner only? A. Not at all. Q. Those blood spots on there could have dropped on the coat from the open wounds in this lady? A. If the lady was alive it would be very possible. Q. I see and do you think Doctor a lay person, one inexperienced in medicine, would be able to determine whether a woman in her condition was dead or alive unless he had some medical training and experience? A. That is true, it is very difficult even sometimes, even for a physician whether a given individual is actually deceased. Q. I understand then the

example you gave concerning the spurting of blood from an artery was merely an illustration that came to your mind and you are not attempting to tell this jury that the blood on that coat arrived on this in that manner, is that correct? A. That is correct. Q. And your testimony concerning those blood spots in merely an estimate, a guess and you don't know, do you Doctor just exactly how those blood spots did get on there? A. I do not."

The state also called Miss Maxine Banker, a girl friend of Miss Phelps, who testified, in substance, as follows: That Miss Phelps met her, by prearrangement, at about six-thirty on the evening of December 15, 1947, and that they went to the Roundtable Club at about eight o'clock, where they shared the same table the entire evening, and were never apart more than five minutes at any time; that she knew Bruce Perkins and did not see him at the club that evening, and thought she would have seen him if he had come there and talked to Miss Phelps; further, that her father came to the club at about ten-thirty and joined her and Miss Phelps at their table; that the three of them left the club together between twelve-thirty or one o'clock; that she was not feeling well and her father dropped her at their home and then took Miss Phelps to her grandmother's, with whom she was then living, about three miles west of Olympia; that both Miss Phelps and herself were at all times entirely sober, having consumed no liquor at the club other than about three bottles of beer.

Mr. Lloyd H. Banker was the next witness called by the state in rebuttal. He testified that he was connected with the Olympia police department, specifically with the parking meter division. He had attended the Elks lodge meeting the evening of December 15th. He went to the Roundtable Club about ten-thirty, and, when the club closed around twelve-thirty or one o'clock, took his daughter and Miss Phelps to their respective homes, dropping his daughter at their home because she was not feeling well. He reached the home of Miss Phelps' grandmother at approximately one o'clock.

"Q. Do you know whether or not she entered her home at that time? A. I let her off in front of her house. It was very foggy, so I didn't watch her go into the house."

He further testified that he sat at the same table with his daughter and Miss Phelps at the Roundtable Club and did not see any person resembling the defendant talk to Miss Phelps during the evening.

Miss Phelps was called and testified that she had lunch with Perkins on December 15th, and did not see him again that day; that she went to the Roundtable Club with Miss Banker between eight and nine o'clock in the evening, and was with her at all times until shortly after the club closed about a quarter to one; that Miss Banker's father joined them at their table about ten-thirty; that she did not see Bruce Perkins at the club that night or anywhere after midnight or in the early morning of December 16th; that she thought he was then in Seattle; that she left the club with the Bankers a little before one o'clock, and that Mr. Banker dropped his daughter at their home and took her to her grandmother's where she arrived shortly after one o'clock; that she did not go to the Jessup home that night, and had never at any time been in the Jessup house; that, when Mr. Banker let her out of the car at her grandmother's house, she immediately went to bed after exchanging a few words with her grandmother and remained in bed until morning.

Shirley Phelps' grandmother was called as a witness and testified, in substance, that she remembered that, on the evening of December 15, 1947, her husband took her and her grandson, first to the Olympia Y. M. C. A. and then to the Garfield school to her grandson's Monday night scout meeting, and that they also took Shirley into town on the same trip. She further testified that she got home that evening at about eleven; that some time later the lights of a car shone into her windows and Shirley came in, and she asked who brought her home; that Shirley went to bed immediately and on the following morning got up in time to take the 8:20 bus; that she talked with her before the bus arrived, and that she did not seem to be agitated in any respect, but to be her normal self.

Jewell Smith, also called by the state on rebuttal, testified, in substance, as follows: That she lived at 221 east 13th, which is "catty-corner" across the alley from the Jessup house, and further testified:

"Q. Are you acquainted with Shirley Phelps? A. I have met her. Q. Has she ever been at your home? A. No. Q. Have you ever had occasion to tell her where you live? A. No. Q. Directing your attention to sometime in the early morning hours of December 16th, in the neighborhood of somewhere between two and three o'clock, did you hear anyone at your front door? A. No. Q. Had someone been there at that hour in the morning, you think you would have heard them? A. Yes I do. Q. Why? A. I sleep light and my house is small and anyone stepping up on the porch, I would probably hear them. Q. Did you hear any screams that night about that time? A. No."

In this appeal, it is contended that the appellant was not afforded a fair trial, and the relief prayed for is that the judgment and sentence be held void and the appellant granted a new trial.

Appellant's counsel, in their brief, contend that a number of errors, prejudicial to the defendant, were made by the trial court which entitle defendant to the relief sought in this court. The assignments of error, omitting for the time being Nos. I and IV, are as follows:

"II. In permitting the introduction of testimony respecting the type of blood found upon the objects discovered in the home of Mr. and Mrs. Jessup and upon the clothing of appellant.

"III. In permitting the jury to visit the death scene when appellant was not present.

"V. In refusing to give defendant's requested instruction No. 5.

"VI. In refusing to give defendant's requested instruction No. 6.

"VII. In refusing to give defendant's requested instruction No. 8.

"VIII. In refusing to give defendant's requested instruction No. 9.

"IX. In denying defendant's motion for new trial.

"X. In entering judgment on the verdict."

Assignments Nos. I and IV grow out of an incident which occurred as the trial was about to begin, and in the presence and hearing of the panel from which the jury was about to be selected. It is recorded in the statement of facts, as follows:

"THE COURT: Are both sides ready? MR. FOSTER: The defense is ready, but we would like to take up one matter at this time. We see the Attorney General here of the State of Washington to assist in the prosecution of this case. We would like to inquire the purpose of his presence, particularly with respect to the statutory authority of the Attorney General under the circumstances. I call your Honor's attention to Rem's. Rev. Stats., Section 112, appearing in Volume 2 of the Code, particularly with reference to Section 4, defining the powers and duties of the Attorney General 'to consult with and advise the several prosecuting attorneys in matters relating to the duties of their office, and when, in his judgment the interests of the State require, he shall attend the trial of any person accused of a crime, and assist in the prosecution.' The second section which I would like to call to your Honor's attention is Rem.'s Rev. Stats., Section 112-1 in the supplement, being a part of the Laws of 1937 which reads,

" 'The Attorney General shall, upon the written request of the Governor, investigate violations of the criminal laws within this state. If, after such investigation, the Attorney General shall believe that the criminal laws are improperly enforced in any county, and that the prosecuting attorney of that county has failed or neglected to institute and prosecute violations of such criminal laws, either generally or with regard to a specific offense or classes of offenses, then the Attorney General shall direct such prosecuting attorney to take such action in connection with any prosecution or prosecutions as the attorney general shall determine to be necessary and proper. If any prosecuting attorney after the receipt of such instructions from the attorney general shall fail or neglect to comply with such instructions within a reasonable time, the attorney general is hereby authorized to initiate and prosecute such criminal prosecutions as he shall determine. In connection therewith, the attorney general shall have the same powers as would otherwise be vested in the prosecuting attorney. From the time the attorney general shall have initiated or taken over a criminal prosecution, the prosecuting attorney shall not have power

or authority to take any legal steps relating to such prosecution except as authorized or directed by the attorney general.'

"The question we would like to ask is under which section is the attorney general present in court. If he appears here under the provisions of Section 112, subdivision 4, then I believe in the interests of this defendant, we should require the attorney general to state that in his judgment the interests of the State require his presence here. It is a little unusual that the attorney general pick out one prosecution, rather than others, and I think this defendant is entitled to know the basis under which he is proceeding, Section 112 or 112-1. MR. TROY: I am here at the request of the prosecuting attorney who asked me to assist in this case, and I think it is much ado about nothing and somewhat of a grandstand stunt in front of these jurors. MR. FOSTER: I object to the remarks of counsel. MR. HINKLE: Counsel was present in court when I moved the association of Mr. Smith Troy as counsel for the prosecution. At that time — (interrupted) MR. FOSTER: That is not correct, Mr. Hinkle. We were not—(interrupted) MR. HINKLE: Wasn't it at the time of the arraignment? MR. FOSTER: We were not here at the arraignment. MR. HINKLE: I advised your Honor at that time and I will state at this time that because of the activities of myself and deputy in the investigation of this matter, the necessity that I will be a witness in this case, that I called upon the attorney general as provided by law and made a personal request that if Mr. Troy was available and could assist, rather than sending an assistant, that he himself assist. He has so arranged and is here and associated as counsel for the prosecution of this matter. I will state I will be a witness in this matter and from that point on Mr. Troy will be in charge of this matter. THE COURT: The record may show he has been associated with the prosecution. MR. FOSTER: Under Section 112 or 112-1? THE COURT: He is associated in the prosecution, so I think that is sufficient. MR. FOSTER: Will the record please show that the Defendant notes an exception to the Court's ruling in allowing the attorney general to participate in this matter. THE COURT: Yes."

Assignment No. I alleges that the trial court erred:

"In refusing to require the attorney general to advise the court, pursuant to Rem. Rev. Stat., Sec. 112, that in his judgment the interests of the state required that the attorney general conduct the prosecution on behalf of the state."

■ Assignment No. IV alleges that the court erred: "In giving the jury instruction No. 17."

Instruction No. 17 read as follows:

"You are instructed that under the statutes of this State the Attorney General is a proper party to be associated with the Prosecuting Attorney in the prosecution of criminal cases."

It is argued, in appellant's brief, that this instruction placed undue emphasis upon the presence of the attorney general as a member of the staff of the prosecution, and that such undue emphasis operated to place the defendant at a disadvantage and deprived him of his right to a fair trial. In the colloquy which took place at the beginning of the trial, hereinabove quoted in full, defendant's counsel strongly intimated, in the presence and hearing of the jury panel, that 'it was unlawful for the attorney general to conduct the state's case. It was not unlawful, and, under the circumstances, the state was entitled to have the instruction complained of given.

Furthermore, it seems to us that much greater emphasis would have been placed upon the attorney general's presence at the trial if he had been required by the court to state, in the presence of the prospective jurors, that, in his judgment, *the interests of the state required that he conduct the prosecution on the state's behalf.* Yet, the court's failure to require the attorney general to do that very thing is assigned as error in assignment No. I. In our opinion, there is no merit in assignment of error No. 1, nor in its related assignment No. IV.

■■ Assignment No. II, hereinbefore quoted in full, is to the effect that prejudicial error was committed by the trial court in permitting the introduction of testimony respecting the type of blood found upon the objects discovered in the Jessup home and upon the appellant's clothing. It is conclusively shown in the record that there is no merit in assignment No. II.

During the early stages of the trial, the state called as a witness Briggs J. White, a chemist and serologist in the

F. B. I. laboratory at Washington, D. C., to give testimony concerning bloodstains found upon certain objects discovered in the Jessup house, and upon the clothing which the appellant wore at the time of the murders. As has been hereinbefore stated, articles found in the Jessup house and clothing which the defendant wore on the night of the murders were sent to the F. B. I. laboratory at Washington, D. C., for examination. Dr. White testified that there were various bloodstains on the shirt, that he could not categorically state that they were made by human blood, but that the stains on the socks were made by human blood; and further, that it was of blood type "O." Mr. Meyer, of counsel for defendant, strenuously objected to any testimony as to blood types, saying, among other things, that he did not see that it was in any way material to the case, and that, while the fact that it was human blood was material, the type of blood was not. Later, some testimony was offered regarding the type of blood found on the articles sent to the F. B. I. Defendant's objection to the testimony as to blood types was renewed, and vigorously renewed several times later.

After Dr. White had completed his testimony, and several other witnesses had been heard, the matter was again brought up by Mr. Meyer, who moved on behalf of the defense to strike that part of Dr. White's testimony concerning the types of blood. This precipitated a long, legal discussion in which the court, Mr. Troy, and Mr. Meyer participated, a transcription of which covers eight pages of the statement of facts. Finally, addressing Mr. Meyer, the attorney general said:

"I believe you did move to have the Court strike that part of the testimony insofar as the blood type or grouping. We will not resist their motion on that phase of it, but, of course, we insist and would care to argue further along the lines, along the line found in these cases as to the human blood and authenticity that it is human blood. But, I believe, you concede that. MR. MEYER: That is right."

At the close of the argument on the motion to strike, the court ruled upon the motion, as follows:

"Ladies and gentlemen of the jury, testimony that was admitted yesterday relative to the type of blood that is that Dr. White testified to may be stricken from the record and you will pay no attention to that: That particular test as to type, you will pay no attention to. The rest of the testimony is before you. MR. TROY: So there can't be any confusion I think it is important that the prosecution request that Your Honor explain a little further that by type means the reference to type "O" or "A" or "B" and not the fact that it is human blood. THE COURT: Yes. It is understood that all his testimony except where he said it was "A" or "O" or something of that sort."

Since the testimony complained of in assignment No. II was stricken and the jury explicitly instructed to disregard it, there is no merit in assignment No. II, and this is so, for another conclusive reason. If the testimony regarding types of blood had not been stricken, it could only have been prejudicial to the defendant, Perkins, because of its tendency to prove that the bloodstains on his clothing were made by Mrs. Jessup's blood. But, as shown by evidence heretofore quoted, there was no doubt about that, for Perkins himself admitted that the bloodstains on his clothing were caused by Mrs. Jessup's blood, although claiming that they were made when he picked up her dead body and placed it on the davenport after she had been murdered by his intended bride.

There is some semblance of merit in assignment No. III, but, in our opinion, no more than that. This assignment claims, as prejudicial error, an action taken by the trial court as the presentation of the state's case was coming to a close. At that time, the following occurred:

"MR. TROY: May it please the Court, the State has but one more witness. That witness is a member of the Seattle Police Department and by reason of other commitments and duties, it is impossible for him to be here until 1:30. As far as I know, the State will then close its case. THE COURT: *Would it be of any assistance to the jury to go through the premises that are depicted by this map?* JUROR No. 4: Leave us retire and discuss it a little bit. THE COURT: We will have a recess for a little while. (Whereupon a short recess was taken. Upon reconvening the following

proceedings were had:) THE COURT: Ladies and Gentlemen of the Jury, the Bailiff informs me that you do desire to visit the premises that are depicted on the map, is that so? (Jury indicates affirmatively.) THE COURT: You will understand that you will not talk among yourselves or allow anyone to talk to you about this. You are not to take any evidence over there. *You will visit the premises only for the purposes of helping you to better understand the testimony that is before you. You are not to take additional testimony and you are not to talk to anyone and don't do anything that will disqualify yourselves. Be careful not to separate or allow anyone to get in among you or talk to you you and you will especially understand that you are not to talk it over among yourselves.* You are to hold your minds entirely open until the case has been finally submitted to you. The Bailiffs will take you over there and we will be at recess until 1:30." (Italics ours.)

Pursuant to the court's permission, the jury made the visit. We find nothing whatever in the record to the effect that the appellant or either of his counsel objected to a jury view, or that the appellant requested that he or his counsel be permitted to be present when the jury visited the Jessup house, or rather, as the trial court phrased it, "the premises that are depicted on the map," that is, by state's exhibit No. 17, which not only depicted the Jessup house showing its floor plan and the location of the entrance, but its relative position as to the streets, alleys, driveways, and various structures in the neighborhood. It is contended in appellant's brief that this map was so complete that a visit to the premises could in no way be of assistance to the jury in understanding the evidence in the case. As to that, we may say that it may not have been as to the evidence that had been already admitted, but, in considering the whole record, we have at times wished that it was proper and possible for us to examine the location of Mrs. Jewell Smith's apartment, and particularly to stand at the side of that apartment and look at the Jessup house. A view from that point would, we think, raise a doubt as to whether Perkins could see and hear as much as he claims to have seen and heard while standing at that point at two or two-thirty a. m., December

16, 1947. We do not know whether or not the jury made such a test, but they were clearly authorized to visit all the premises depicted on the map by the trial court's instruction permitting the visit. We find the map (exhibit No. 17) is of but little use in evaluating Perkins' testimony as to his following Miss Phelps after he crossed Thirteenth avenue.

Appellant's chief contention in support of the assignment now under discussion is that permitting the jury to visit the premises was in violation of Art. I, § 22, of the Washington constitution, which was amended and amplified in 1922 by amendment 10, to read as follows:

"ART. I, § 22. In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, *to meet the witnesses against him face to face,* to have compulsory process to compel the attendance of witnesses in his own behalf, to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases: Provided, the route traversed by any railway coach, train or public conveyance, and the water traversed by any boat shall be criminal districts; and the jurisdiction of all public offenses committed on any such railway car, coach, train, boat or other public conveyance, or at any station or depot upon such route, shall be in any county through which the said car, coach, train, boat or other public conveyance may pass during the trip or voyage, or in which the trip or voyage may begin or terminate. In no instance shall any accused person before final judgment be compelled to advance money or fees to secure the rights herein guaranteed." (Italics ours.)

Specifically, the right which it is contended was violated was appellant's right to meet the witnesses against him face to face, as guaranteed by that portion of the tenth amendment which we have italicized in the above quotation. There is nothing to show, however, that any witness testified before the jury when it was making the view complained of, or that members of the jury in any way breached that part of the court's instructions which read as follows:

"You will visit the premises only for the purposes of helping you to better understand the testimony that is before you. You are not to take additional testimony and you are not to talk to anyone . . ."

■ Appellant was not denied the right to meet the witnesses against him face to face, insured by Art. I, § 22, of the state constitution, as amended by the tenth amendment thereto. See the opinion of this court in *State v. Lee Doon,* 7 Wash. 308, 34 Pac. 1103. For a general discussion of the right to confront adverse witnesses, see *State v. Bolen,* 142 Wash. 653, 654, 254 Pac. 445; *State v. Johnson,* 194 Wash. 438, 78 P. (2d) 561.

■■ It is also contended, and with more plausibility, that permitting the jury view violated Rem. Rev. Stat., § 2145 [P.P.C. § 140-17], which section reads as follows:

"No person prosecuted for an offense punishable by death, or by confinement in the penitentiary or in the county jail, shall be tried unless personally present during the trial."

As is amply demonstrated in the briefs of the parties, there is a conflict of authority on the question whether or not a view of the premises by the jury is a part of the trial, but it appears to be pretty well settled in the case law of this state that it is not. See the opinion in *State v. Lee Doon, supra.*

The question as to whether or not a jury view is a part of the trial was later discussed in *State v. Much,* 156 Wash. 403, 417, 287 Pac. 57, and it was again held that such a view is not a part of the trial. We do not consider that the later opinion of this court in *State v. Hilsinger,* 167 Wash. 427, 9 P. (2d) 357, weakens the holdings of the *Lee Doon* and *Much* cases, that a view is not a part of the trial, although the *Hilsinger* case is classified in *Snyder v. Massachusetts,* 291 U. S. 97, 119, 78 L. Ed. 674, 54 S. Ct. 330, 90 A. L. R. 575, as holding that a jury view is a part of the trial. In that case, Judge Cardozo, the author of the majority opinion, said, by way of introduction to a long discussion of the legal history of jury view, as shown in the English cases: .

"There is an approach to the subject from the viewpoint of history that clarifies the prospect. We may assume that the knowledge derived from an inspection of the scene may be characterized as evidence. Even if this be so, a view is not a 'trial' nor any part of a trial in the sense in which a trial was understood at common law. This is seen from two circumstances."

Both parties rely on the case of *Snyder v. Massachusetts, supra,* the state, on the above statement of Judge Cardozo in the majority opinion, the appellant, on the following statement in Judge Roberts' dissent:

"Such difference of view as the authorities exhibit as to the prisoner's right to be present at a view arises out of a disagreement on the question whether the view is a part of the trial, whether it is, in effect, the taking of evidence. The great weight of authority is that it forms a part of the trial, and for that reason a defendant who so desires is entitled to be present. Many decisions hold that he may waive the privilege; . . ."

It will be noted that Judge Roberts, having first stated that a view by the jury was a part of a trial and that a defendant who so desires is entitled to be present, immediately adds: "Many decisions hold that he may waive the privilege; . . ."

In an annotation in 30 A. L. R. 1357, 1373, entitled: "Presence of accused during view by jury," it is said:

"Where the defendant fails to ask permission to accompany the jury on its view, or to object to the view being had in his absence, he is held to have waived the right to be present."

Decisions of a number of state courts of last resort are cited in support of the above statement.

The valuable annotation in 30 A. L. R. 1357 is supplemented by a later annotation on the same subject in 90 A. L. R., beginning at page 597, in which the subject is treated under subheads, "Right to be present," "Waiver of right to be present," "Right to waive," "What constitutes waiver," and "Duty to be present."

In the article on Criminal Law, beginning on page 743 of 14 Am. Jur., there are many sections which throw light on the problems presented in this appeal, such as those discussing the right to be confronted by witnesses (§§ 176-188, inclusive). That portion of the article is immediately followed by "Right to be present at trial" (§§ 189-198, inclusive). This is followed by a section entitled "Waiver of right" (§ 199), which reads, in part, as follows:

"There is a direct conflict among the authorities as to whether one accused of crime can waive his right to be present at the trial. According to the prevailing view, if the felony is not capital and the accused, being at large on bail, is present at the beginning of the trial but thereafter voluntarily absents himself, or, being in custody, makes his escape from the jurisdiction, the court has the right to proceed with the trial to its completion, and the absence of the defendant operates as a waiver of his constitutional right to be present at every stage of the trial. In a few jurisdictions the accused may waive his right to be present even in capital cases. Sometimes statutory authority to waive the right exists.

"Even apart from any question of waiver, a mere temporary and voluntary absence of the accused from the courtroom during his trial has been held in numerous cases, even those involving capital offenses, not to afford ground of error. The cases taking a contrary view are very limited in number.

"It is clear that the accused may waive any trial at all, for he may plead guilty and thus subject himself to the severest penalty which might follow a trial. Since he can do this, he may waive any mere privilege on the trial that is designed only to aid him in shielding himself from such result. If a person charged with crime flees, allowing him to take advantage of his own wrong and obtain his discharge or a new trial would savor of absurdity and positive injustice. . . ."

It is further said, in § 201 of the same article:

"The question whether a person accused of crime may waive his right to be present at a view by the jury depends largely on the view taken by the courts as to whether a view by the jury constitutes a part of the trial and a taking of evidence or a mere aid to assist the jury in understanding the evidence given. *In those jurisdictions where it is held*

*that a view by the jury is not a part of the trial or the taking of evidence, it is uniformly held that the accused may waive his right to be present.* In some jurisdictions it is held that the accused may waive his right to be present at a view by the jury, even though such a view constitutes a part of the trial. In a few jurisdictions it is held that a view by the jury constitutes a part of the trial and the taking of evidence and that, therefore, the accused cannot waive his right to be present." (Italics ours.)

Note the sentence which we have italicized in the above quotation. As we have hitherto shown, it is held in this jurisdiction that a view by the jury is not a part of the trial or taking of evidence. Since the view by the jury in this case was not a part of the trial or the taking of evidence, we are of the opinion that Rem. Rev. Stat., § 2145, was not violated by permitting the jury to visit the death scene when the defendant was not present.

It is said in 14 Am. Jur. 909, § 202:

"When the accused does not request to be permitted to accompany the jury on its view and makes no objection to the jury going without him, he is presumed to have waived his right to be present."

The annotations in 30 A. L. R. 1373 and in 90 A. L. R. 597 are cited as supporting the above statement, and they appear to do so.

We understand it to be admitted that in this case the accused did not request to be permitted to accompany the jury and made no objection to the jury going without him. In our opinion, there is no merit in assignment No. III.

■ The remaining assignments are, for the most part, based upon the court's refusal to give certain specific instructions as requested by the appellant. In view of the great length to which this opinion has grown, we will dispose of the remaining assignments, except No. VII, by the general statement that a court is not obliged to give instructions in the exact language proposed. We could demonstrate, by quotations from the record, although it would take a formidable amount of space to do so, that, while the trial judge in this case refused to give a number of requested

instructions in the exact language in which the requests were submitted, he did give the substance of the requested instructions. It is said, in one of the recent opinions of this court, *State v. Hartley*, 25 Wn. (2d) 211, 224, 170 P. (2d) 333, a case wherein the appellant was appealing, as in this case, from a death sentence:

"This court has often stated that instructions must be considered as a whole, and if, when so considered, they properly state the law and include all the elements which constitute the crime charged, they are sufficient, even though some one of them may omit some essential part. *State v. Denby*, 143 Wash. 288, 255 Pac. 141; *State v. Stratton*, 170 Wash. 666, 17 P. (2d) 621; *State v. Cox*, 197 Wash. 67, 84 P. (2d) 357; *State v. Refsnes*, 14 Wn. (2d) 569, 128 P. (2d) 773.

"In line with that rule, instruction No. 20, given by the court, charged the jury as follows:

" 'It is the duty of the court to instruct you as to the law governing this case, and these instructions are given to you as one connected body and series and should be so regarded and treated by you, that is to say, you should apply the instructions as a whole to the facts proved and not select any single instruction alone and place undue emphasis upon it.' "

In the instant case, the court gave thirty-one instructions, and among them the following:

"No. 27. These instructions are given by the court as a whole and are so to be considered by the jury. Each and every instruction is to be considered by you in connection with all the other instructions. You should not pick out any particular instruction and place undue emphasis on such instruction."

In our opinion, the instructions given in this case, when considered as a whole, include all the elements which constitute the crimes charged, and were in every way comprehensive, adequate, and fair to the accused.

The record in this case shows that the trial judge carefully guarded the appellant's rights, not only during the trial, but also prior to and after the trial: (1) He permitted appellant to withdraw a plea of guilty and substitute a plea of not guilty; (2) he procured and appointed competent

and able counsel to conduct his defense; and (3) made it possible for the appellant to have his conviction reviewed in this court, by ordering that the cost of the statement of facts be borne by Thurston county. It was entirely within the trial court's discretion to refuse to make such an order, as we have recently held in another capital case (*State ex rel. Bird v. Superior Court*, 30 Wn. (2d) 785, 194 P. (2d) 374).

We have excepted assignment of error No. VII from the general ruling above made, because the appellant has cited very direct authority in its support from previous decisions of this court. Among the appellant's requested instructions was one reading as follows:

"You are instructed that if you find that the evidence introduced by the state or by the defendant or both, or that the *lack of evidence* is sufficient to raise in your minds a reasonable doubt that the defendant committed the offenses alleged, you must acquit the defendant." (Italics ours.)

It is said that the requested instruction is in the same language as that requested in *State v. Herwitz*, 109 Wash. 153, 186 Pac. 290, and was refused, and that it was held that the instruction should have been given and the judgment reversed and a new trial granted. While the opinion says the requested instruction should have been given, it is not at all clear that the refusal to give it was held to be reversible error. Other errors were claimed. One is spoken of, on p. 158, as "manifest error, requiring a reversal of the judgment of conviction which was afterwards pronounced against the appellant." Still another error was claimed, which was held to be "objectionable comment . . . in its nature prejudicial." As to the error assigned with respect to failure to give the instruction requested, the opinion says:

"The fourth and final assignment relates to the instruction of the court to the jury on the question of reasonable doubt. As a part of its instruction on the particular question, the court gave the following:

" 'A reasonable doubt is such a doubt as exists in the mind of a reasonable man after he has fully, fairly and carefully

compared and considered all of the evidence introduced on the trial. If, after a careful consideration and comparison of all of the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt.'

"At the conclusion of the charge, the defendant requested the court to give an instruction to the effect that a reasonable doubt could arise from *a lack of evidence* as well as from the evidence given to the jury. The request was refused, *and we do not find that it was covered elsewhere in the instructions.* The requested instruction should have been given. It announced a correct principle of law which the defendant was entitled to have brought to the attention of the jury.

"For the errors indicated, the judgment is reversed and a new trial awarded." (Italics ours.)

That an instruction requesting the court to instruct that a reasonable doubt may arise from a "lack of evidence" should be given, is, therefore, squarely held in *State v. Herwitz, supra,* and it was further said that such an instruction "announced a correct principle of law which the defendant was entitled to have brought to the attention of the jury." The law reports are replete with cases on this point. Our researches have convinced us that the *Herwitz* case does not state the majority rule as of the time it was decided or now.

In 67 A. L. R. 1372, there is an annotation on the subject "Failure of instruction on reasonable doubt to include phrase 'lack of evidence' or equivalent as reversible error." The note opens with the following statement:

"General rule. It is generally held that the failure to include the phrase 'lack of evidence' or its equivalent in an instruction on reasonable doubt is erroneous. Only a few cases pass on whether such error is reversible, but in the absence of any express statement to that effect, it must be taken that it is not reversible."

The above statement is followed by the citation of numerous cases from the appellate courts of almost all of the states, including our own. Liberal quotations are made from a number of such opinions. Finally, it is said, on page 1379:

"Minority rule. Only two jurisdictions, Mississippi and Missouri, apparently recognize the failure to include the phrase 'lack of evidence' or its equivalent as reversible error. [Citing cases.]"

We think that the case of *State v. Herwitz, supra,* does not hold that, when instructing on reasonable doubt, the failure to instruct that it may arise "from a lack of evidence," constitutes reversible error. It is true the holding of the lower court was reversed, but it also clearly appears in the opinion that there were two other very serious errors. The opinion does say that the questioned instruction "announced a correct principle of law" and "should have been given," and that statement was incidentally commended some years later in the opinion in *State v. Vukich,* 158 Wash. 362, 290 Pac. 992. It seems to us, however, that the views expressed in the *Herwitz* case were pretty well weakened, if not wholly repudiated, in the opinion in *State v. Costello,* 133 Wash. 170, 172, 233 Pac. 307. The opinion in the *Costello* case was written by Judge Mitchell, who had joined in the opinion in *State v. Herwitz, supra,* decided in 1919. In deciding the point now under discussion, he made no mention of the *Herwitz* case, but based his decision upon the authority of a contra decision handed down in 1895. We quote from the opinion in the *Costello* case, *supra:*

"Another assignment is that, in the instruction on reasonable doubt, the jury was told that it 'must be a reasonable one, and arise from a fair, ordinary and reasonable consideration of the evidence,' the objection being that there should have been added the words 'or from want of evidence.' The discussion of this point is, of course, a consideration of only a part or detached portion of all the instructions given, but, withal, we think the contention too technical, for, as said in *State v. Krug,* 12 Wash. 288, 41 Pac. 126, 'but we think that the jury were not misled by going into any refined distinctions between the phrases "want of evidence" and "should grow out of the evidence." ' "

We here quote a little more fully from the opinion in *State v. Krug,* 12 Wash. 288, 41 Pac. 126:

"Instruction No. 3 is to the effect that a reasonable doubt is such a doubt as a man of ordinary prudence, sensibility

and decision in determining an issue of like concern to himself as that before the jury is to the defendant would allow to have any influence upon him or cause him to pause or hesitate in arriving at his determination; that such a doubt should grow out of the evidence in the case and not be merely speculative, conjectural or imaginary. This instruction is criticized because it is alleged that it assumes that there might be a doubt in the minds of a jury, but that such would be a speculative, conjectural or an imaginary one. We do not think there is anything in the instruction that would warrant the conclusion that there was any such an assumption, or that it could be deduced that the court thought that if there was a doubt that such doubt would be speculative, conjectural or imaginary. As a matter of fact, speculative, conjectural or imaginary doubts should not lead to the acquittal of the defendant charged with any crime. It might be that it would have been a better use of language if the court had instructed the jury that a proper doubt could be entertained from the *want of evidence*; but we think that the jury were not misled by going into any refined distinctions between the phrases 'want of evidence' and 'should grow out of the evidence.' "

The law reports show that the question with which we are now dealing has had a history in most of the states quite similar to that which it has had in our own. The use of the words "lack of evidence" has, by many state courts, been strongly recommended for a period of years, and later, for a period of years, been held not to be necessary. But few of the state courts have made a consistent record in dealing with the matter. One of the strongest cases we have found, holding that failure to instruct that a reasonable doubt may be caused by a "lack of evidence" is error, is that of *State v. Anderson*, 209 Iowa 510, 228 N. W. 353, 67 A. L. R. 1366, wherein it was held, by a five to four vote, that a failure to so instruct was error, and the trial judges emphatically warned that it would so be considered in the future. We quote the dissenting opinions:

"KINDIG, J. (dissenting).—I think the instruction on reasonable doubt was sufficient. If the evidence was weak, there would be doubt. If, perchance, the testimony did not fully cover some fact, there would be doubt. If, finally, there was inadequacy anywhere in the evidence, there

would be doubt. As a matter of fact, that is all the instruction contended for by the majority could ask of the jury.

"DE GRAFF, J. (dissenting).—I heartily join in the dissent filed by Justice Kindig. A rule of the character involved herein must find its origin in logic and the rule of reason. I have no objection, and there can be no objection, to the use of the phrase 'lack of evidence' in an instruction given by the trial court governing the question of reasonable doubt, but I hold that it is not *mandatory* on the part of a trial court to use the phrase 'lack of evidence.' True, this court for a few years past has suggested to the trial courts of this state, in opinions filed, that it is a better practice to use the phrase 'lack of evidence' in an instruction governing reasonable doubt. During the judicial history of this state, we have never until now considered it reversible error for a trial court to omit this phrase in such an instruction. One possible exception exists. *State v. Smith*, 192 Iowa 218. This decision on this point should be overruled. We have repeatedly refused to follow it. We should continue to follow the pronouncement in *State v. Ritchie*, 196 Iowa 352, l. c. 362, wherein the phrase 'lack of evidence' was under discussion, and wherein Justice Weaver, speaking for the court, said:

" 'Indeed, the distinction between the two forms of instruction is somewhat over-refined and shadowy. A reasonable doubt, arising from the case as made by the evidence, implies an inquiry into the effect of the entire showing in support of the indictment, both its strength and its weakness; or, in other words, what the evidence reveals and what it fails to reveal. A juror of average intelligence could not fail to understand the charge.'

"The trial courts have said, in defining 'reasonable doubt,' that the jury must find, from all the evidence in the case, and upon nothing else, that the defendant is guilty, beyond a reasonable doubt. Every crime charged in an indictment has certain essential elements, and it is the function of the court to explain to the jury these essential elements or factors, and when this is done, the jury is informed of the law of the case. Each of these essentials must be established on the evidence beyond a reasonable doubt; and in the consideration by the jury of the evidence bearing on these essentials, if there should be a lack of evidence, it logically follows that the jury, in considering the evidence, would find a lack of evidence, if there is a lack of evidence to sustain each and every essential element of the crime

charged. The phrase 'lack of evidence' is surplusage, or, if used, is simply precautionary. It adds nothing. In the instant case, the sufficiency of the evidence is not questioned. It is conceded that a jury question is presented; and to reverse the finding of the trial jury on the mere supposition that, in considering 'all the evidence, and nothing else,' it did not consider the 'lack of evidence,' is a most violent presumption. Such a claim is supertechnical; and in my judgment, the pronouncement by the majority is in the very teeth of the statute, since the statute provides that this court 'must examine the record, without regard to technical errors or defects which do not affect the substantial rights of the parties, and render such judgment on the record as the law demands.' Section 14010, Code of 1927. I find no logical reason or legal basis for making mandatory the rule as announced by the majority.

"EVANS and MORLING, JJ., join in dissenting."

■ In our opinion, the above dissents are quite persuasive. In the instant case, the members of the jury were told, in other instructions given, that they could convict only upon strong and convincing evidence. For example, they were instructed as follows:

"You are further instructed that no one should be convicted upon mere suspicion, or because he may have had an opportunity to commit the crime; but the evidence should be so strong and convincing in your minds as to satisfy you beyond a reasonable doubt and to a moral certainty that the defendant is guilty, and unless you find from the evidence that the defendant has been proved guilty beyond a reasonable doubt and to a moral certainty, and that each and every element embraced in either or both of the crimes charged, or of the lesser ones therein included, has been proved beyond a reasonable doubt, then you should find the defendant not guilty."

The necessity of evidence in order to convict was again stressed in an instruction primarily concerned with circumstantial evidence:

"The Court instructs you that while you must be convinced of the guilt of the defendant beyond any reasonable doubt, from the evidence, in order to warrant a conviction, the proof need not be the direct evidence of persons who saw the offense committed. The acts constituting the offense

and connecting the defendant therewith may be proved by circumstances, that is, circumstantial evidence. Circumstantial evidence is legal and competent in criminal cases and if it is of such a character as to exclude every reasonable hypothesis other than the guilt of the accused, it is entitled to the same weight as direct and positive testimony. What is meant by circumstantial evidence is the proof of such facts and circumstances connected with or surrounding the commission of the crime charged, as tend to show the guilt or innocence of the party charged, and if these facts and circumstances are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt and to exclude every reasonable hypothesis of innocence, then such evidence is sufficient to authorize the jury to find the defendant guilty."

Surely, it was unnecessary to further tell the jury that a reasonable doubt might arise from "lack of evidence." We think that this is well shown in the dissenting opinions above quoted from the case of *State v. Anderson, supra.*

In the case of *State v. Herwitz, supra,* the instruction contended for was of the first importance to the defense. Courts may take judicial notice of their own records. We have examined the record in that case, studied the briefs filed therein, and read all the evidence in the cause. In that case, the prosecuting witness claimed, and testified, that he had given the defendant eight hundred dollars to buy some gold currency which at that time could be secured only by paying a premium, and that the defendant had not procured him the gold, nor would he return the eight hundred dollars. No evidence whatever was introduced to support his claim. His word was the only evidence tending to prove the defendant's guilt. There was in that case, as distinguished from this, a real and fatal lack of evidence sufficient to raise many doubts, and, in so far as that case, already discredited by the *Costello* case, *supra,* tends to lay down a general rule, that a refusal to give an instruction in a criminal case to the effect that a reasonable doubt may arise from "lack of evidence," constitutes reversible error, we now reverse it.

Finding no error in the record, we conclude, as did the trial court, that the appellant is not entitled to a new trial. The judgment and sentence of the trial court is, therefore, affirmed, and this cause remanded to the jurisdiction of the superior court of Thurston county for such further proceedings as the laws and statutes of the state prescribe and require.

JEFFERS, C. J., STEINERT, MALLERY, and GRADY, JJ., concur.

HILL and BEALS, JJ., concur in the affirmance of the judgment.

SIMPSON, J. (dissenting)—I am unable to concur in the foregoing opinion so far as it approves the refusal of the trial court to instruct the jury as follows:

"You are instructed that if you find that the evidence introduced by the state or by the defendant or both, or that the lack of evidence is sufficient to raise in your minds a reasonable doubt that the defendant committed the offenses alleged, you must acquit the defendant."

This court in *State v. Herwitz*, 109 Wash. 153, 186 Pac. 290, definitely committed itself to the rule that in criminal cases it is error for a trial court to refuse to instruct the jury that a reasonable doubt might be raised in their minds because of the lack of evidence. We there stated in no uncertain words that such an instruction

". . . *ANNOUNCED A CORRECT PRINCIPLE OF LAW WHICH THE DEFENDANT WAS ENTITLED TO HAVE BROUGHT TO THE ATTENTION OF THE JURY.*"

The majority opinion states that the *"Herwitz* case does not state the majority rule as of the time it was decided or now." What, may I ask, has that to do with this case? We have the rule here. Why not follow it?

The majority, on p. 867, states:

"That an instruction requesting the court to instruct that a reasonable doubt may arise from a 'lack of evidence' should be given, is, therefore, squarely held in *State v. Herwitz, supra,* and it was further said that such an instruction 'announced a correct principle of law which the de-

fendant was entitled to have brought to the attention of the jury.'"

Then, on p. 868, I find the following:

"We think that the case of *State v. Herwitz, supra,* does not hold that, when instructing on reasonable doubt, the failure to instruct that it may arise 'from a lack of evidence,' constitutes reversible error."

I fail to find any consistency in the two statements. In the first, the majority approves the rule, and in the second, it repudiates the first statement.

The majority makes the point that the court in reversing the trial court in the *Herwitz* case found "two other very serious errors." Many, many cases will be found in the volumes of our reports, and reports of other courts, in which an appellate court has reversed trial courts and based its decision upon several errors. The fact that there were "two other very serious errors" upon which this court based its opinion, does not in the least destroy the force and effect of the court's holding relative to the refusal to give the instruction relative to the *lack of evidence.*

The majority opinion then goes on to say that the views expressed in the *Herwitz* case "were pretty well weakened, if not wholly repudiated, in the opinion in *State v. Costello,* 133 Wash. 170, 172, 233 Pac. 307." An examination of the record in that case, in which the *Herwitz* case was not even mentioned, brings to view the fact that no assignment of error was predicated upon the refusal of the court to give an instruction such as proposed in the case at bar. Neither did the defendant Costello propose an instruction such as proposed in this case. This proves that the question relating to the giving of an instruction, as proposed in the instant case, and as urged in the *Herwitz* case, was not before the court at all in the *Costello* case.

In the case of *State v. Krug,* 12 Wash. 288, 41 Pac. 126, appellant did complain because the court in its instruction omitted to state that a reasonable doubt could grow out of the want of evidence. However, appellant in that case did

not, as here, propose an instruction relative to the lack of evidence.

This short review of the three cases cited by the majority proves that the statements made in the *Krug* and *Costello* cases were mere *dicta*.

The majority, then, without citing other cases, attempts to impeach the holding in *State v. Anderson*, 209 Iowa 510, 228 N. W. 353, 67 A. L. R. 1366, by citing and quoting at length from the dissenting opinions. When, may I ask, did a dissenting opinion from a sister state become the law of this state? The only purpose or reason for using the dissenting opinion of the judges of a sister state as a basis for *"reversing"* overruling an opinion of this court which has stood as the approved law in this state for twenty-nine years is that the majority could not find any case in the United States upon which to base an opinion. I quote a portion of the majority opinion in the *Anderson* case to show just what the law is in the state of Iowa:

"The appellant excepted to the court's instruction on reasonable doubt, and the same is now urged as a ground for reversal. In this instruction, the court told the jury:

" 'All of the matters left for your determination are to be determined by you alone from the evidence before you, and after a full and careful consideration of the same.'

"All matters left for determination necessarily included the question of re[a]sonable doubt. Appellant's contention is that this instruction did not include, but excluded, a reasonable doubt which might arise from lack or want of evidence. It is apparent that the appellant is right in his contention; for the court, in the instruction, in terse language, states that the question of reasonable doubt, as well as all other matters for their determination, is 'to be determined by you alone from the evidence before you.' We have repeatedly refused to approve an instruction on reasonable doubt which excludes a reasonable doubt arising from the lack or want of evidence. In *State v. Smith*, 192 Iowa 218, we said:

" 'This instruction [one on reasonable doubt] is complained of. It fairly states that a doubt, to be reasonable, must, for one thing, be caused by the evidence adduced. We cannot approve this.'

"In *State v. Smith*, 194 Iowa 639, we declared:

" 'Again, the instruction is faulty in advising the jury that a doubt must arise from a consideration "of all the evidence in the case." In *State v. Smith*, 192 Iowa 218, referring to an instruction of this kind, we quoted with approval the following from 16 Corpus Juris 997, Section 2411: "As a general rule, an instruction that a reasonable doubt must be one suggested by, or arising out of, the evidence adduced is erroneous, as it excludes all reasonable doubts that may arise from the lack or want of evidence." A reasonable doubt may, and generally does, arise from the lack or want of evidence in the case. We cannot approve of an instruction in this form.'

"In *State v. Tonn*, 195 Iowa 94, we find the following pronouncement:

" 'We cannot approve of this instruction. A reasonable doubt is not necessarily one that arises from a consideration of the facts and circumstances as shown *in evidence* in the case. A reasonable doubt, as a general rule, arises from a *want* of evidence.'

"In *State v. Flory*, 198 Iowa 75, we declared:

" 'We have repeatedly held that reasonable doubt may well arise from lack of evidence, and that an instruction which omits this element will not be approved.'

"In *State v. Tennant*, 204 Iowa 130, we said:

" 'It is, of course, elementary that a reasonable doubt may arise from the absence of evidence   *   *   *   . Instructions on the subject of reasonable doubt should be so framed as to make it clear to the jury that a doubt may arise both from the absence of evidence and from the evidence introduced.'

"In *State v. Patrick*, 201 Iowa 368, the trial court gave the following instruction:

" 'You are to try and determine this case according to the evidence produced and submitted to you in open court on this trial, and the law given you in charge by the court in these instructions, and upon nothing else.'

"We there said of this instruction:

" 'Complaint is lodged against this instruction in that it unduly limits the jury in the consideration of the case, as far as the evidence is concerned. It says, in words, that the case is to be determined according to the evidence produced and submitted in open court and the law given in charge by the court, and upon nothing else. We are disposed to think that this complaint has merit. The jury has the right

not only to consider the evidence before it, but to consider the want or lack of evidence. It is entitled to consider all fair and reasonable inferences and deductions which may be made from the evidence before it; but to say that it must consider only the evidence before it and the law as given by the court would apparently exclude from its consideration the above matter. If the instruction is to be given on a retrial of the case, it should be remodeled in accordance herewith.'

"It will be observed that the import of the instruction condemned in *State v. Patrick, supra,* is the exact equivalent of that portion of the instruction given in the instant case as a part of the instruction on reasonable doubt which is hereinbefore quoted. If, upon a retrial of the *Patrick* case, the court had given the condemned instruction, and an appeal had been taken to this court, would there have been any hesitancy in reversing the trial court? The writer of this opinion is inclined to the belief that we would have unhesitatingly reversed the trial court for not following our directions. We condemned the instruction because it is erroneous, and the instruction in the instant case is subject to the same criticism and condemnation. We have declared in the foregoing pronouncements what we recognize to be the truth: that a reasonable doubt is not necessarily one that arises from a consideration of the facts and circumstances as shown in evidence in the case, and that a reasonable doubt, as a general rule, arises from a lack or want of evidence. We refuse to approve instructions on the subject of reasonable doubt which exclude the element of lack or want of evidence. If we do not or cannot approve an instruction, we necessarily disapprove it. When we disapprove or cannot approve an instruction, it is because it is erroneous."

The majority opinion handed down in the *Anderson* case was followed and reaffirmed in *State v. Grattan,* 218 Iowa 889, 256 N. W. 273; *State v. Parkin,* 230 Iowa 991, 299 N. W. 917; and, *State v. King,* 232 Iowa 16, 4 N. W. (2d) 244.

See, also, *Smith v. State,* 135 Fla. 835, 186 So. 203.

It is of interest to note that, in the *Grattan* and *Parkin* cases, eight judges signed the opinions, and that all of the judges concurred in the opinion written in the *King* case.

An annotation in 67 A. L. R. 1372 says:

· "It is generally held that the failure to include the phrase 'lack of evidence' or its equivalent in an instruction on reasonable doubt is erroneous."

True, the editors of A. L. R. state that only a few cases pass on whether such error is reversible. That statement is quite true. The reading of the cases cited in A. L. R. show that in a great many of them the question was not squarely before the court, or the instructions, while not using the words "lack of evidence" used other words which had the same meaning.

I desire to call attention to a few cases, aside from those in Iowa, which distinctly pass upon the question presented here.

In *Carwile v. State*, 148 Ala. 576, 39 So. 220, defendant was convicted of the crime of murder. The conviction was reversed by the supreme court of Alabama because of the failure of the trial court to give a requested instruction that:

"The absence of sufficient satisfying evidence before the jury may offer ground for reasonable doubt of the defendant's guilt."

In the case of *Gaston v. State*, 161 Ala. 37, 49 So. 876, the court reversed the conviction on the ground that the trial court erred in its refusal to instruct that the absence of sufficiently satisfying evidence may be a ground of reasonable doubt of defendant's guilt.

The Alabama court of appeals, in *Fealy v. Birmingham*, 15 Ala. App. 367, 73 So. 296, reversed the conviction because the trial court refused to charge that:

"The absence of sufficient satisfactory evidence before the jury may afford grounds for reasonable doubt of defendant's guilt."

The best statement of the rule and the reasons for it, are found in *State v. Blue*, 136 Mo. 41, 37 S. W. 796, where it was said:

"An instruction given by the court defining reasonable doubt to be 'a substantial doubt growing out of and consistent with the evidence' is criticised by defendant on the ground that it is misleading, and too narrow, and excluded

all reasonable doubt that might have arisen from the lack or want of evidence.

"There seems to be much force in this contention. The instruction is not only misleading, but manifestly erroneous, in that it deprived defendant of the benefit of any reasonable doubt as to his guilt that might have arisen from the insufficiency of the evidence or upon a full and fair review of all the evidence in the case. It is upon this theory that such an instruction is justified, and not upon the idea of the doubt of defendant's guilt growing out of and being consistent with the evidence. His guilt must not only grow *out* of the evidence as it were, but it must appear therefrom beyond a reasonable doubt, and unless it was so shown he was entitled to an acquittal. It will not do to say that defendant's innocence must appear from and be consistent with the evidence; by this, the burden was cast upon him, while it devolved upon the state to show his guilt beyond a reasonable doubt. If there was a substantial doubt of defendant's guilt arising from the insufficiency of the evidence he was entitled to an acquittal, and the court should have so instructed."

In *Kelly v. State*, 112 Miss. 245, 72 So. 928, the following instruction was granted for the state:

"The court instructs the jury for the state that by a reasonable doubt is meant not a mere speculative doubt or vague conjecture, mere supposition, or hypothesis, but such a doubt as reasonably arises out of the testimony; a doubt for which a reason can be given."

The court said, in reversing a judgment of conviction:

"Besides being generally objectionable in attempting to define a reasonable doubt, the instruction is erroneous in declaring that a reasonable doubt must arise out of the evidence when it may arise also from the want of evidence."

It seems to me, from every legal standpoint, that the lack of evidence is something beneficial to the cause of the defendant, and the jury should be told of this in plain terms, especially if an instruction is asked for along that line. If there is a lack of evidence on the part of the state, certainly there is a failure of proof. Evidence, we know, need not be positive, but it may be largely circumstantial. A lack of evidence, however, means a lack or failure of both kinds.

How can the jury ever be convinced from all the evidence before them, beyond every reasonable doubt, without taking into consideration the lack of evidence? Clearly, if there is a case presented to the court and jury in a criminal cause and there is a lack of evidence, there can then be no basis for the jury upon which they may rest their conviction. Conviction must find its predicate on the evidence and not on the lack of evidence.

Courts instruct the jury on the necessary essentials of a crime; that is, they instruct the jury that the state must prove certain things beyond a reasonable doubt. If the state fails to present evidence along these lines, then there is a failure of proof and the jury should be entitled to know that that failure of proof or lack of evidence is sufficient to raise in their minds a reasonable doubt.

Counsel, in presenting their client's cause to the jury, should be in a position to point out that there is a lack of evidence or failure of proof, and in that way possibly persuade the jury that there is a reasonable doubt of the defendant's guilt.

The rule announced in the *Herwitz* case is a proper one. It is one that was, and is, in accord with the announced holding of the majority of courts in the United States. I can give no better reason for abiding by, and reaffirming, the rule than given by the supreme court in *State v. Grattan,* 218 Iowa 889, 256 N. W. 273, in language which reads as follows:

"It is urged in substance that the rule announced in the Anderson case is unduly lenient to the guilty defendant, whose punishment is long overdue. The Constitution is professedly comprehensive and liberal in its attitude towards a defendant accused of crime. In the eyes of the Constitution, he is innocent and continues to be so until his guilt be proved. The objective of the Constitution is not to favor the guilty but to protect the innocent against the hazard of false punishment. In the pursuit of this objective, it takes large chances of favor to the guilty rather than to imperil the innocent. Better that the guilty escape than that innocence be ravished. Until guilt be proved, the Constitution awards asylum to the innocent and guilty alike

under the same roof. To each of them legal protection is guaranteed. If a guilty defendant is not entitled to the protection guaranteed by the Constitution, then no defendant is. Nor can the legal guilt of a defendant ever be known until his trial has been had under the protection of the Constitution."

By various opinions, of which this is one, this court is slowly but surely taking away the rights of individuals accused of crime. The only recourse is costly appeals to the supreme court of the United States.

In my opinion, the court committed a reversible error in refusing to give the instruction relative to the lack of evidence. The case should be reversed and a new trial granted.

SCHWELLENBACH, J., concurs with SIMPSON, J.

